

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Francine Yates,<br><br>  Plaintiff,<br><br>v.<br><br>The John Marshall Law School<br><br>  Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**08CV4127**
**JUDGE ASPEN**
**MAGISTRATE JUDGE COX**

Complaint for Plaintiff

**RECEIVED**
Jul 21 2008
JUL 2 1 2008  T.C
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT.

Francine Yates
14114 S. Edbrooke Avenue
Chicago, IL  60827
Pro Se

## POINTS AND AUTHORITIES

*42 U.S.C. § 12111–12117*................................................................*5*

*42 U.S.C. § 12131–12165*................................................................*6*

*42 U.S.C. § 12181–12189*................................................................*6*

*29 U.S.C. Section 794*....................................................................*9*

*29 U.S.C. Section 706(8)(B)*...........................................................*9*

*34 CFR 104.3(j)(20)(i)*...................................................................*9*

*34 CFR 104, Appendix A*.................................................................*9*

*45 CFR 84.3(j)(2)(i)*.......................................................................*9*

*20 U.S.C. Section 1401(a)(15)*.........................................................*11*

*405 ILCS 5/2-100(a)*......................................................................*11*

*775 ILCS 5/1-102*..........................................................................*11*

*18 U.S.C. 1621*.............................................................................*47*

*28 U.S.C. 1746*.............................................................................*47*

*815 ILCS 505*...............................................................................*47*

*28 C.F.R.§ 35.130(d)*.....................................................................*51*

### Case Law

*Olmstead v. L.C. (98-536) 527 U.S. 581 (1999) 138 F.3d 893*.....................*10*

*Francine Yates v. The Chicago Transit Authority 2004CF2159, 21BA41078*..........*15*

*Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority 06-3107*..........................................*24*

*New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*...............................*41*

*Cruzan v. Missouri Department of Health, 497 U.S. 261, 278 (1990)*................*45*

### Tables

Table of Homelessness Statistics.....................................................*25*

Table of Notable Disbarments.........................................................*50*

## I. FACTS AND PROCEDURAL CONTEXT

This case found its inception in the fact that the plaintiff, Francine Yates, (Francine Y.) complained to William Powers, Dean, of the John Marshall Law School about being harassed, sexually harassed and tempted to fraudulently embezzle money from the Chicago Transit Authority's claim fund through coercion by Ronald Huberman, CTA's President, and Mayor Richard Daley. The plaintiff filed a charge of employment discrimination against the Chicago Transit Authority, the Illinois Department of Human Rights and the City of Chicago in January 2004. The case was fraudulently mooted pass the trial courts altogether and passed to the Court of Appeals. While on appeal, a group of Appellate Court judges conspired with Huberman and Daley, fraudulently dismissing a winning case with an exceptional amount of substantial evidence. The case number is 06-3107. The conspirators' goal was to settle the case with the plaintiff, through coercion, forcing her to embezzle money as an absurd remedy which would allow her to obtain her settlement. On June 13, 2008, the plaintiff placed a call to the FBI headquarters in Chicago, IL and spoke with Patrick Fitzgerald's office, making them aware of the entire situation involving CTA, the City of Chicago, the State of Illinois, the John Marshall Law School and all other conspirators and harassers involved with the case. Patrick Fitzgerald's office contacted the John Marshall Law School between June 13, 2008 and June 16, 2008 to investigate the plaintiff's complaint surrounding embezzlement, fraud and coercion.

As a young woman with promise, purpose and destiny, Francine Y.'s desire was to become an uncompromising, accomplished attorney in the areas of labor and employment law, employee benefits litigation, intellectual property and trial advocacy. She possesses immense integrity and is extremely intelligent. Because of a very real, traumatic life experience, she embraced the desire to excel in the legal field. Her wisdom, self-determination and relentless aspirations all

gave her strength throughout the enduring oppression she has experienced and is currently being subjected to. Her innate capabilities and a great deal of prayer helped her persevere in the midst of adversity while enduring the hardship of homelessness. The John Marshall Law School destroyed her ambitions and aspirations to achieve the prestigious honor of becoming a high profile, unchallenged attorney when they intentionally broke the law and denied her access into their law school.

The plaintiff, Francine Y., applied for admission into the John Marshall Law School in the January 2008 and the August 2008 semesters. Her January 2008 application was ignored altogether because she did not submit a sixty dollar application fee. The plaintiff did not submit the fee because she was homeless and financially impoverished. Although financially handicapped, she tried to obtain the application fee, but those she asked with the promise to repay were not willing to extend a financial loan to her. As a result, her application was never reviewed. She disclosed the fact that she was homeless on both applications for admission.

During the plaintiff's second attempt for admission, she was able to borrow the money from a Christian church and attached a money order to her application for admission into the August 2008 semester of the John Marshall Law School. The plaintiff was sent a letter dated May 5, 2008 denying her admission into the John Marshall Law School. After she was denied admission, the plaintiff went to see William Powers; Dean, of the John Marshall Law School in May of 2008. She disclosed her psychiatric disabilities and made him aware of her circumstances surrounding her disabilities as well as the fact that she was currently a homeless individual. Mr. Powers asked to review her file and agreed to let her know the outcome of the board's decision by Friday, May 23, 2008. He stated that he needed to go before the committee to take another look at her application. The plaintiff was intentionally ignored. Francine Y.; the

plaintiff, made several attempts to resolve and bring closure to the entire ordeal. Finally, William Powers emailed the plaintiff the school's decision on May 30, 2008. Again, she was denied admission into the John Marshall Law School. The John Marshall Law School did nothing to help the plaintiff, they conspired against her by willfully breaking the law, obstructing and impeding justice.

## II. ARGUMENT AND DISCUSSION

### *Charge A: Discrimination/Basis: Disability, Diagnosis = Major Depression & Anxiety*

The plaintiff; Francine Y., was treated and diagnosed in 2003 with major depression, anxiety and high blood pressure. It is an uncontested fact that the plaintiff is suffering from extreme depression and anxiety which are disabilities defined and protected under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act as well as other laws. She applied for admission and acceptance into the January 2008 and the August 2008 semesters of the John Marshall Law School. Francine Y. disclosed her disabilities to William Powers; Dean, of the John Marshall Law School on or around May 12, 2008. The plaintiff met all of John Marshall's admissions criteria for acceptance into their law school, inclusive of the fact that her low LSAT score was protected by Section 504 of the Rehabilitation Act, allowing for a reasonable accommodation to be made for the plaintiff. The plaintiff was prepared to provide the law school with the appropriate documentation in support of her disabilities; however, they never requested the pertinent copies. On May 30, 2008, the plaintiff received an email from William Powers; Dean, of the John Marshall Law School, stating that the school was unable to admit the plaintiff. Francine Y. was never requested to provide copies of her documented disabilities by physicians who treated her because the John Marshall Law School intentionally ignored her request for admission and conspired to keep her from becoming an attorney. It is the plaintiff's

3

belief that the John Marshall Law School conspired to keep her from becoming an attorney after she complained about engaging in the protected activity of filing a lawsuit against the CTA and the City of Chicago. The plaintiff also mentioned the continued harassment and coercion that she was experiencing at the hands of Ronald Huberman and Mayor Richard Daley because she would not help them embezzle money from CTA's, the City of Chicago's and the State of Illinois' claim fund as an absurd remedy to receiving her settlement from a prior lawsuit. On June 13, 2008, the plaintiff placed a call to Patrick Fitzgerald's office of the United States Federal Bureau of Investigations.

The John Marshall Law School has demonstrated their effectiveness in breaking laws which severely wound, undermine and ostracize homeless, African-American women with disclosed disabilities. The law school took no measure to modify any of their policies to accommodate the plaintiff's disabilities. She was intentionally ignored on a repetitive basis. William Powers told the plaintiff that the only reason she was denied access into the John Marshall Law School was that her LSAT score was too low. Because the plaintiff has been suffering from extreme depression and anxiety resulting from constant harassment by Ronald Huberman, Chicago police officers and coercion by Mayor Richard Daley, her LSAT scores have been adversely affected. The harassment has not ceased since the plaintiff filed a charge of discrimination against the Chicago Transit Authority, the City of Chicago and the State of Illinois in January of 2004. Modifying John Marshall's policy to admit the plaintiff with a much lower LSAT score than other entering students because of her psychiatric disabilities and the rareness of her circumstances does not impose any financial hardship on the John Marshall Law School. Also, it does not diminish the school's credibility or the quality of the education that is associated with the law school. In fact it helps to establish a prima facie case with supporting evidence of a law

school which is conducive to embracing diversity, seeking out, actively developing and fostering a diverse, heterogeneous participation in the legal field while simultaneously combating various forms of discrimination. The LSAT is one raw score which determines nothing in the real world. It functions as a two edged sword which can be used to help a law school scout potential attorneys and as tool to help them weed out many who are not wanted because of biases, prejudices, stereotypes and blatant, intentional discrimination.

**The Americans with Disabilities Act of 1990 (ADA)** prohibits discrimination on the basis of disabilities in employment, state and local government, public accommodations, commercial facilities, transportation, and telecommunications. The ADA also prohibits private employers, state and local governments, employment agencies and labor unions from discriminating against qualified individuals with disabilities in job application procedures, hiring, firing, advancement, compensation, job training, and other terms, conditions, and privileges of employment. The ADA covers employers with fifteen or more employees, including state and local governments. It also applies to employment agencies, labor organizations and to the United States Congress. To be protected by the ADA, one must have a disability or have a relationship or association with an individual with a disability. An individual with a disability is defined by the ADA as a person who has a physical or mental impairment that substantially limits one or more major life activities, a person who has a history or record of such an impairment, or a person who is perceived by others as having such an impairment. Major life activities are activities that an average person can perform with little or no difficulty such as walking, breathing, seeing, hearing, speaking, learning, and working. A qualified employee or applicant with a disability is an individual who, with or without reasonable accommodation, can perform the essential functions of the job in question. An employer is required to make a reasonable accommodation

to the known disability of a qualified applicant or employee if it would not impose an "undue hardship" on the operation of the employer's business. Reasonable accommodations may include, but are not limited to making existing facilities used by employees readily accessible to and usable by persons with disabilities; job restructuring, modifying work schedules, reassignment to a vacant position; acquiring or modifying equipment or devices, adjusting or modifying examinations, training materials, or policies and providing qualified readers or interpreters. An undue hardship is defined as an action requiring significant difficulty or expense when considered in light of factors such as an employer's size, financial resources, and the nature and structure of its operations. *42 U.S.C. § 12111–12117.*

**Title II of the ADA** has two sections. These sections relate to public services and public transportation. Both sections state that a "public entity" can be any state or local government or any department or agency thereof. The lack of accessibility or certain services can be considered discrimination, regardless of who it actually affects. The first section covers public agencies (local, county, state, etc., government and their units). That section generally requires the agencies to comply with regulations similar to Section 504 of the Rehabilitation Act. These rules cover access to all programs offered by the entity. Access includes physical access described in the Uniform Federal Accessibility Standards or the ADA Standards for Accessible Design and access that might be obstructed by discriminatory policies or procedures of the entity. The other section of Title II is specific to public transportation provided by public entities. This section requires the provision of paratransit services by public entities. *42 U.S.C. § 12131–12165.*

Under **Title III of the ADA**, no individual may be discriminated against on the basis of disability with regards to the full and equal enjoyment of the goods, services, facilities, or accommodations of any place of public accommodation by any person who owns, leases (or

leases to), or operates a place of public accommodation. "Public accommodations" include most places of lodging such as hotels, recreation, transportation, education, dining, stores, care providers, and places of public displays, among other things. *42 U.S.C. § 12181–12189.*

The John Marshall Law School made no attempt to rectify the situation through fully accommodating the plaintiff's disabilities by admitting her as an entering Fall 2008 student. They conspired along with Mayor Richard Daley and Ronald Huberman to deny her access into John Marshall's Juris Doctor's program.

Lastly, to demonstrate John Marshall's unwillingness to abide by the **Americans with Disabilities Act,** the building that the school is located in presents a paradigm example of the school's intentional reluctance and failure to comply with federal, state and local laws which govern them as a higher institution of learning. The plaintiff is unaware of the present owner of the building that the John Marshall Law School is located in. The defendant needs to disclose the owner of the building in a court of law to help determine whose liability it is for not being in compliance with federal, state and local laws. For example, if a fire should break out, the building that the John Marshall Law School is located in appears to be somewhat outdated and creates hazards as well as potential risks for people utilizing the building. Individuals in need of a wheelchair and and/or walkers will not be able to fully utilize the fire escape if an emergency should break out such as the fire that occurred in the Cook County building in 2003 leaving them with the fire escape as their only route to safety. In the fire that occurred in the Cook County building in 2003, a disabled person who required the use of a wheelchair died because they could not properly exit the building. How can someone in a wheelchair or one who depends solely on a walker escape the torrents of a vicious fire by use of an outdated fire escape if it should be their only effective route to safety? Also, at least one of the women's washrooms is designed so that

the person wishing to make use of the toilet has to ascend one step to access the stalls. The design of this particular bathroom presents a potential hazard because an individual utilizing a wheelchair will have some difficulty getting their chair up and down the step and may possibly sustain injuries in the process. Lastly, there is not a bathroom monitor readily available on site to assist the disabled who require the use of a wheelchair. Some of the bathroom stalls appear smaller than they should be in order to accommodate individuals with disabilities which require the use of a wheelchair. Keep in mind that some individuals are much larger than others and their obesity may be the primary reason for the use of a wheelchair. If the designated handicapped bathroom stall is smaller than normal, or cannot accommodate the larger wheelchair designed for individuals whose disabilities are defined by their obesity, the school is not in compliance with the Americans with Disabilities Act.

On June 20, 2008, the plaintiff came to the John Marshall Law School to pick up some documents that were left for her to retrieve from security. The plaintiff saw a female child between the ages of three and five years of age playing and running through the admissions office. If a person or someone in a wheelchair came to the admissions office, the child might have been injured because the door pushes in, making it difficult to see a small child playing and running through the office. This incident is another example of how the John Marshall Law School takes no measure to abide by the law to reduce and minimize workplace hazards. Obviously they feel that play time is more important than performing legal duties and responsibilities. The safety of the students, faculty and guests with and without disabilities have been compromised and intentionally ignored as well as disregarded within the John Marshall Law School. John Marshall has demonstrated that accommodating persons with disabilities is too impossible to achieve, so they seek to break the ADA laws instead. The John Marshall Law

8

School is not the American Legal System. They do not make laws; however, their primary responsibility is to abide by the laws that govern them. It is not the plaintiff's responsibility to remind the school of the laws that govern them or to make sure that the school is 100% in compliance with those laws.

The ADA's nondiscrimination standards also apply to federal sector employees under section **501 of the Rehabilitation Act**, as amended, and its implementing rules. Also, **Section 504 of the Rehabilitation Act of 1973** is "designed to eliminate discrimination on the basis of a disability in any program or activity receiving Federal financial assistance and ensure individuals with disabilities the opportunity to pursue their employment, education, and recreational goals free from discrimination. *29 U.S.C. Section 794*. A "disabled person" is one "who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." *29 U.S.C. Section 706(8)(B)*. A "physical or mental impairment" is "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular, reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine, or "(b) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. *34 CFR 104.3(j)(20)(i), 45 CFR 84.3(j)(2)(i)*.

The John Marshall Law School is defined as a public accommodation and a public entity under the ADA and Section 504 of the Rehabilitation Act. The law school also conducts classes in an integrated setting which are conducive to learning. By denying the plaintiff admission into its

law school, the defendant stereotyped the plaintiff because of disabilities.    The plaintiff perceived that she was being stereotyped and segregated by the verbal, nonverbal and implied actions of the defendant meaning that no crazy, black, female, African-Americans were wanted at the John Marshall Law School. The plaintiff perceived that the law school was classifying her as a dangerous, psychotic person who would inflict harm on others, and as a result, their law school was not the appropriate place for her.  Lastly, a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. *28 C.F.R.§ 35.130(d).*    On June 22, 1999, the United States Supreme Court held in *Olmstead v. L.C.* that the unnecessary segregation of individuals with disabilities in institutions may constitute discrimination based on disability. The court ruled that the Americans with Disabilities Act may require states to provide community-based services rather than institutional placements for individuals with disabilities. This historic pronouncement makes attainable a goal long-sought by people with disabilities and advocates. *Olmstead v. L.C. (98-536) 527 U.S. 581 (1999) 138 F.3d 893.*

Specific learning disabilities are interpreted as defined by the **Education of the Handicapped Act** to include "a disorder in one or  more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in imperfect ability to listen, think, speak, read, write,  spell, or do mathematical calculations.  Such disorders include such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia and developmental aphasia". *20 U.S.C. Section 1401 (a)(15), 34 CFR part 104, Appendix A.*

Reasonable Adjustments/modifications may be required as necessary to prevent discrimination (such as adjusting the time permitted to finish degree requirements, substituting specific courses

required to complete degree requirements, and adapting the manner in which specific courses are conducted.) Tests must measure the student's achievement, not his or her impaired sensory, manual, or speaking skills (except when that skill is the factor being measured). Auxiliary aids may be required such as taped texts, interpreters, or other effective methods of making orally delivered materials available to students with hearing impairments; readers in libraries for students with visual impairments; and classroom equipment adapted for use by students with manual impairments. Private colleges and universities that receive federal assistance are already subject to the nondiscrimination provisions of Section 504 of the Rehabilitation Act of 1973. The John Marshall Law School receives federal funding to help sustain and ensure the continued operations and longevity of its law school.   Areas of impact are wide, including employment, student services, and public services. Discrimination must be eliminated in recruitment, admissions, courses, and tests. Facilities, libraries, and housing must be accessible. Athletics and extra-curricular activities must be available to individuals with disabilities. Services and events available to the public generally must also be accessible and available on an equal basis to individuals with disabilities. This includes, museums, exhibits, cultural events, athletic events and transit systems.

Lastly, voluntary and involuntary treatment of mentally ill and disabled persons in Illinois is illegal and governed by the **Mental Health and Developmental Disabilities Code.** The Code states that no recipient of services shall be deprived of any rights, benefits, or privileges guaranteed by law, the Constitution of the State of Illinois, or the Constitution of the United States solely on account of the receipt of such services. *405 ILCS 5/2-100(a)*

**The Illinois Human Rights Act,** *(775 ILCS 5/1-102),* states that it is the public policy of the state of Illinois for:  **(A) Freedom from Unlawful Discrimination.** To secure for all individuals

within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State.   **(F) Implementation of Constitutional Guarantees.** To secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970.   **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities rigorously take affirmative action to provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the public. **(H) Unfounded Charges.** To protect citizens of this State against unfounded charges of unlawful discrimination, sexual harassment in employment and sexual harassment in higher education, and discrimination based on citizenship status in employment.

The **1970 Illinois Constitution** states the following: **Article I, Section 19:  No Discrimination Against The Handicapped**  All persons with a physical or mental handicap shall be free from discrimination in the sale or rental of property and shall be free from discrimination unrelated to ability in the hiring and promotion practices of any employer. *(See Exhibits A-P)*

***Charge B:  Discrimination/Basis:  Race(Ethnicity) = Black, African-American***

The plaintiff, Francine Y., is a black, African-American.  The John Marshall Law School was aware of this prima facie fact because she checked off her ethnic background as being such on their application both times she applied for admission.  She also made several appearances at the law school in person to provide visible proof of her ethnicity.  The plaintiff applied for admission and acceptance into the January 2008 and the August 2008 semesters of the John Marshall Law School. Francine Y. disclosed her disabilities to William Powers; Dean, of the John Marshall Law School on or around May 12, 2008.   The plaintiff met all of John Marshall's admissions criteria for acceptance into their law school, inclusive of the fact that her low LSAT score was protected by the ADA and Section 504 of the Rehabilitation Act, allowing for a reasonable accommodation to be made for the plaintiff.  The plaintiff was also falsely arrested on May 26, 2008 by Chicago police officers under the direction of Ronald Huberman and Mayor Richard Daley.  She was released on an I-bond for a battery that she did not commit. She made an appearance in court on July 9, 2008 and the police officers did not show up causing her case to be stricken off with leave to reinstate.  The plaintiff is in the process of having the charge of battery, which she did not commit, expunged from her record.  Francine Y. mentioned this to William Powers; Dean, of the John Marshall Law School in June 2008.     John Marshall has taken measures to accommodate many students who are white and of other ethnicities other than African-American.  William Powers mentioned to the plaintiff when she met with him in his office on or around May 12, 2008 that the school has admitted students who have disabilities.  The school made accommodations for these students and many of them were of ethnic backgrounds other than African-American. Dean Powers was in a position of power, so he took advantage of a vulnerable black, African-American woman who was handicapped, a woman who had nappy hair which was braided in an African-American hair style, a woman with a cute,

13

southern African-American authentic accent mixed with slang, a woman who came to see him alone and someone who was classified by at least two disadvantaged groups. Because the plaintiff; Francine Y., is a female, she was treated differently than a male would have been treated given similar circumstances. About four to five years ago, an African-American, female by the name of LaQuesha Hardy applied for admission into the John Marshall Law School. The John Marshall Law School gave the applicant; LaQuesha Hardy, and extremely difficult time throughout the admissions process. The applicant also had something in her background which was criminal in nature that was not a deterrent to her being accepted into law school. LaQuesha Hardy was retaliated against while she was a student at their law school. The school told her that they had not received her checks in payment for her school expenses and instructors stated that they did not receive program documents which were in fact emailed to them. Because LaQuesha Hardy was a black female with an authentic African-American name, the fact that she was affiliated with the West Side of Chicago and the criminal charge in her background, she was stereotyped by the John Marshall Law School as not being someone who was capable of becoming an attorney. The plaintiff; Francine Y., was intentionally ignored by the John Marshall Law School because she is a black, African-American. Because she had other facts disclosed about her as well, she perceived the John Marshall Law School to be saying to her: "We do not want any black, homeless, ghetto women, who are psychotic with criminal backgrounds in this law school. No, we will not be admitting you into this law school, so don't come down here begging anymore. If you do, security will call the police and have you arrested. Also, you do not look like the stereotypical attorney, you're fat, four-eyed with acne and to add insult to injury, you're a nigger that's also a nerd."

It is an established, uncontested fact that the school made no attempts to accommodate the plaintiff based on her defined disability because she was given a letter of denial dated May 5, 2008 as well as an email statement which denied her access into the law school for admission into the Fall 2008 semester as well.  *See Francine Yates   v. The Chicago Transit Authority, 2004CF2159, 21BA41078.*

**The Illinois Human Rights Act** *(775 ILCS 5/1-102)* states that it is the public policy of the state of Illinois for:  **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State.  **(F) Implementation of Constitutional Guarantees.** To secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970.   **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities rigorously take affirmative action to provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the public. **(H) Unfounded Charges.** To protect citizens of this State against unfounded charges of

unlawful discrimination, sexual harassment in employment and sexual harassment in higher education, and discrimination based on citizenship status in employment.

**The 1970 Illinois Constitution, Article I, Section 20: Individual Dignity** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason or reference to religious, racial, ethnic, national or regional affiliation are condemned. *(See Exhibits A-P)*

### *Charge C: Discrimination/Basis: Gender = Female*
The plaintiff; Francine Y., is a female. She disclosed this information to the John Marshall Law School on her application for admission both times she applied. The plaintiff also made physical appearances at the John Marshall Law School as proof of her gender. She applied for admission for acceptance into the January 2008 and the August 2008 semesters of the John Marshall Law School. Francine Y. disclosed her disabilities to William Powers; Dean, of the John Marshall Law School on or around May 12, 2008. The plaintiff met all of John Marshall's admissions criteria for acceptance into their law school, inclusive of the fact that her low LSAT score was protected by Section 504 of the Rehabilitation Act, allowing for a reasonable accommodation to be made for the plaintiff. William Powers mentioned to the plaintiff when she met with him in his office on or around May 12, 2008 that the school has admitted students who have disabilities. Some of the students that were accommodated and accepted for admission by the John Marshall Law School have been male. Dean Powers was in a position of power, so he took advantage of a vulnerable woman who was handicapped, a woman who had nappy hair which was braided in an African-American hair style, a woman with a cute, southern African-American authentic accent mixed with slang, a woman who came to see him alone and someone who was classified by at least two disadvantaged groups. Because the plaintiff; Francine Y., is a female, she was

treated differently than a male would have been treated given similar circumstances. About four to five years ago, an African-American, female by the name of LaQuesha Hardy applied for admission into the John Marshall Law School. The John Marshall Law School gave the applicant; LaQuesha Hardy, and extremely difficult time throughout the admissions process. The applicant also had something in her background which was criminal in nature that was not a deterrent to her being accepted into law school. LaQuesha Hardy was retaliated against while she was a student at their law school. The school told her that they had not received her checks in payment for her school expenses and instructors stated that they did not receive program documents which were in fact emailed to them. Because LaQuesha Hardy was an black female with an authentic African-American name, the fact that she was affiliated with the West Side of Chicago and the criminal charge in her background, she was stereotyped by the John Marshall Law School as not being someone who was capable of becoming an attorney. Because the plaintiff; Francine Y., had other facts disclosed about her as well, she perceived the John Marshall Law School to be saying to her: "We do not want any black, homeless, ghetto women, who are psychotic with criminal backgrounds in this law school. No, we will not be admitting you into this law school, so don't come down here begging anymore. If you do, security will call the police and have you arrested. Also, you do not look like the stereotypical attorney, you're fat, four-eyed with acne and to add insult to injury, you're a nigger that's also a nerd."

Lastly, one paradigm example and prima facie evidence is the fact that the legal profession has more male attorneys practicing law than it does female attorneys. This disparity can only be attributed to inherent biases, prejudices, favoritism and recurring discrimination among all laws schools, looked at individually as well as collectively. This is evident and factually represented through the lower amount of female applicants selected for admission as opposed to males. Over

time, the John Marshall Law School has selected more male than female applicants for admission into their law school. This is a prima facie case of gender discrimination. _See_ _Francine Yates v. The Chicago Transit Authority, 2004CF2159, 21BA41078._

**The Illinois Human Rights Act** *(775 ILCS 5/1-102)* states that it is the public policy of the state of Illinois for:  **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations.  **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State.  **(F) Implementation of Constitutional Guarantees.** To secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970.  **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities rigorously take affirmative action to provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the public. **(H) Unfounded Charges.** To protect citizens of this State against unfounded charges of unlawful discrimination, sexual harassment in employment and sexual harassment in higher education, and discrimination based on citizenship status in employment.

**The 1970 Illinois Constitution states in Article I, Section 18:    No Discrimination on the Basis of Sex**  The equal protection of the laws shall not be denied or abridged on account of sex by the State or its units of local government and school districts. *(See Exhibits A-P)*

### *Charge D:  Harassment/Basis:  Gender = Female*

The plaintiff; Francine Y., is a female. She disclosed this information to the John Marshall Law School on her application for admission in the January 2008 and the August 2008 semesters. The plaintiff also made physical appearances at the John Marshall Law School as proof of her gender.  Francine Y. disclosed her disabilities to William Powers; Dean, of the John Marshall Law School on or around May 12, 2008.   The plaintiff met all of John Marshall's admissions criteria for acceptance into their law school, inclusive of the fact that her low LSAT score was protected by Section 504 of the Rehabilitation Act, allowing for a reasonable accommodation to be made for the plaintiff.   The plaintiff stated to Dean Powers that she believed that the Americans with Disabilities Act applied to educational institutions. Dean Powers' response to the plaintiff was: "Where is your wheelchair?" The implied meaning behind this statement was: "If I can't visibly see your disability, then you don't have one."   The plaintiff was being ridiculed, laughed at and intentionally mocked by William Powers; Dean, of the John Marshall Law School. Francine Y. was offended, deeply humiliated and severely wounded because she was being stereotyped and harassed by Mr. Powers.  She explained to him that her disabilities were psychiatric and not physical in nature.  Francine Y. disclosed the types of disabilities that she was diagnosed and treated for.  Those disabilities are major depression and anxiety. She was also diagnosed and treated for high blood pressure.   Again, the plaintiff was intentionally ignored. Dean Powers was in a position of power, so he took advantage of a vulnerable woman who was handicapped, a woman who had nappy hair which was braided in an African-American

hair style, a woman with a cute, southern African-American authentic accent mixed with slang, a woman who came to see him alone and someone who was classified by at least two disadvantaged groups. Because the plaintiff; Francine Y., is a female, she was treated differently than a male would have been treated given similar circumstances. About four to five years ago, an African-American, female by the name of LaQuesha Hardy applied for admission into the John Marshall Law School. The John Marshall Law School gave the applicant; LaQuesha Hardy, and extremely difficult time throughout the admissions process. The applicant also had something in her background which was criminal in nature that was not a deterrent to her being accepted into law school. LaQuesha Hardy was retaliated against while she was a student at their law school. The school told her that they had not received her checks in payment for her school expenses and instructors stated that they did not receive program documents which were in fact emailed to them. Because LaQuesha Hardy was an black female with an authentic African-American name, the fact that she was affiliated with the West Side of Chicago and the criminal charge in her background, she was stereotyped by the John Marshall Law School as not being someone who was capable of becoming an attorney. Lastly, on or around 6/5/08, the plaintiff came to see William Powers. Scott Davyell; a John Marshall employee, told the plaintiff that Mr. Powers was unavailable to speak with her. He gave her an appointment to see Mr. Powers on 6/10/08. She specifically asked if the law school could keep the appointment because she was unemployed, financially impoverished and spent a good deal of time walking lengthy distances. Again, she was intentionally ignored. The plaintiff received an email on 6/6/08, stating that Mr. Powers would not be able to meet with her on 6/10/08. Dean Powers stated that he attempted to answer all of her questions via email and did not feel that he had anything more to impart. On 6/9/08, the John Marshall Law School sent the plaintiff another

email stating that the law school would not be able to refund her the sixty dollar application fee or return her admissions paperwork. Prior to and after calling Patrick Fitzgerald's office on June 13, 2008, the plaintiff has been deliberately avoided by William Powers; Dean, of the John Marshall Law School. She was lied to and denied the right to receive copies of her admissions documents until she called the FBI on June 13, 2008. On June 16, 2008, John Marshall granted the plaintiff permission to pick up a copy of her admissions documents; however, she was requested to stop by the security desk upon retrieving the documents. Neither William Powers nor Dave Martino was available to assist the plaintiff. Both William Powers and Dave Martino are non-black, male employees of the John Marshall Law School. They were both in positions of power and used their influence to intentionally discriminate against the plaintiff. Each time she came to the law school, she came alone. The took advantage of the plaintiff because they knew she was a handicapped, disabled female. The plaintiff also was extremely vulnerable. The abuse and harassment began on or prior to May 12, 2008 and has continued thus far through June 20, 2008. John Marshall did not give the plaintiff any legal, valid explanation for the continued abuse and harassment. *See Francine Yates v. The Chicago Transit Authority, 2004CF2159, 21BA41078.*

**The Illinois Human Rights Act** *(775 ILCS 5/1-102)* states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection

with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State. **(F) Implementation of Constitutional Guarantees.** To secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970. **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities rigorously take affirmative action to provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the public. **(H) Unfounded Charges.** To protect citizens of this State against unfounded charges of unlawful discrimination, sexual harassment in employment and sexual harassment in higher education, and discrimination based on citizenship status in employment. **The 1970 Illinois Constitution states in Article I, Section 18:    No Discrimination on the Basis of Sex** The equal protection of the laws shall not be denied or abridged on account of sex by the State or its units of local government and school districts. *(See Exhibits A-P)*

### *Charge E: Harassment/Basis: Retaliation for having a disability and being homeless*

On May 12, 2008; the plaintiff, Francine Y., met with Dean William Powers of the John Marshall Law School. She engaged in the protected activity of complaining to him about the coercion, harassment and retaliation she was experiencing at the hands of Ronald Huberman and Mayor Richard Daley because she would not help them embezzle money out of CTA's claim

fund as an absurd remedy to receiving her settlement from a prior lawsuit. In 2004, 2006 and 2007, the plaintiff engaged in the protected activities of filing an employment charge of discrimination against the CTA, City of Chicago and the State of Illinois. Francine Y. belonged to the disadvantaged groups of homelessness and the mentally disabled at the time she applied for admission with the John Marshall Law School. The plaintiff disclosed her psychiatric disabilities to William Powers in their May 12, 2008 meeting. The plaintiff disclosed the fact that she was homeless to the John Marshall Law School on her application for admission into the January 2008 and the August 2008 semesters. The plaintiff also attached an additional addendum to her Fall 2008 application for admission detailing that her LSAT score was low due to living within a homeless environment. The plaintiff met all of John Marshall's admissions criteria for acceptance into their law school, inclusive of the fact that her low LSAT score was protected by the ADA and Section 504 of the Rehabilitation Act, allowing for a reasonable accommodation to be made for the plaintiff. Lastly, on or around 6/5/08, the plaintiff came to see William Powers. Scott Davyell; a John Marshall employee, told the plaintiff that Mr. Powers was unavailable to speak with her. Actually, Mr. Powers was sitting at his desk and did not appear busy or engaged in legal work at all. He appeared to be surfing the web. The plaintiff was deliberately avoided and intentionally ignored. Scott Davyell gave the plaintiff an appointment to see Mr. Powers on 6/10/08. The plaintiff received an email on 6/6/08, stating that Mr. Powers would not be able to meet with her on 6/10/08. On 6/9/08, John Marshall sent the plaintiff another email stating that the school would not be able to refund her the sixty dollar application fee or give her copies of her admissions paperwork. In the meeting between the plaintiff and Dean Powers on May 12, 2008, the plaintiff disclosed the fact that she was homeless, unemployed and the fact that she borrowed the sixty dollar fee from a Christian

23

church. She stated in the meeting on May 12, 2008 that if she would be denied admission, she wanted the law school to refund her sixty dollar application fee along with the money order fee and interest incurred so that she would be able to repay her debt. Dean Powers did not respond, but remained willfully indifferent as well as consciously indifferent through silence and an inherent reluctance to respond. Again, the plaintiff was intentionally ignored. Instead, the John Marshall Law School profited off a homeless, financially impoverished, disabled, African-American, Christian woman as well as a Christian church. The plaintiff also requested a copy of her admissions paperwork. John Marshall stated that the paperwork was the property of the law school and the plaintiff was forbidden to come to the John Marshall School any longer. On June 13, 2008, the plaintiff contacted Patrick Fitzgerald's office and made him aware of the fraud, fraudulent practices and conspiracy to commit fraud among the CTA, the City of Chicago, the State of Illinois and the John Marshall Law School. These acts are all prima facie examples of abuse, harassment, defamation and retaliation. They are also acts of semi-professional hate crimes inflicted against a homeless individual by a law school which refused to help her. The abuse and harassment began on or prior to May 12, 2008 and has continued thus far through June 20, 2008. John Marshall did not give the plaintiff any legal, valid explanation for the continued abuse, harassment, humiliation, defamation and retaliation. The John Marshall Law School's adverse actions followed the plaintiff's protected activities within such a reasonable period of time which directly raises the inference of retaliatory motivation. *See Francine Yates v. The Chicago Transit Authority, 2004CF2159, 21BA41078, 06-3107.*

Over the past eight years, advocates and homeless shelter workers from around the country have received news reports of men, women and even children being harassed, kicked, set on fire, beaten to death, and even decapitated. From 1999 through 2006, there have been 614 acts of

24

violence by housed people, resulting in 189 murders of homeless people and 425 victims of non-lethal violence in 200 cities from 44 states and Puerto Rico. Most hate crimes/violent acts against the homeless are committed not by organized hate groups, but by individual citizens who harbor a strong resentment against a certain group of people. Some are "mission offenders," who believe they are on a mission to cleanse the world of a particular evil. Others are "scapegoat offenders," who violently act out their resentment toward the perceived growing economic power of a particular racial or ethnic group. Still others are "thrill seekers," those who take advantage of a vulnerable and disadvantaged group in order to satisfy their own pleasures. Thrill seekers, ordinary citizens, are the most common perpetrators of violence against people who are homeless.



[1]EIGHT YEARS ANALYSIS (1999—2006) HATE CRIMES / VIOLENCE STATISTICS

[1]Anti-Defamation League, http://www.adl.org/legislative_action/hatecrimes_briefing.html
Leadership Conference on Civil Rights, www.civilrights.org
Anti-Defamation League, http://www.adl.org/legislative_action/hatecrimes_briefing.html

Total number of violent acts over 8 years: 614
Total number of deaths over 8 years: 189
Total number of non-lethal attacks over 8 years: 425
Number of cities where crimes occurred over 8 years: 200
Number of states where crimes occurred over 8 years:  44 states plus Puerto Rico
Age ranges of the accused/convicted: from 11 to 75 years of age
Age ranges of the victims: from 4 months old to 74 years of age
Gender of victims: Male: 359    Female: 48

**Title I of the American with Disabilities Act** states that it is unlawful to retaliate against an individual for opposing employment practices that discriminate based on disability or for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding or litigation under the Americans with Disabilities Act.

**The Illinois Human Rights Act** *(775 ILCS 5/1-102)* states that it is the public policy of the state of Illinois for:   **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations.    **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State.   **(F) Implementation of Constitutional Guarantees.** To secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970.   **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities rigorously take affirmative action to provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the

public. **(H) Unfounded Charges**. To protect citizens of this State against unfounded charges of unlawful discrimination, sexual harassment in employment and sexual harassment in higher education, and discrimination based on citizenship status in employment.

**The 1970 Illinois Constitution, Article I, Section 20: Individual Dignity**  To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned.

The **Title VII Civil Rights Act of 1964** states that an employer may not fire, demote, harass or otherwise "retaliate" against an individual for filing a charge of discrimination, participating in a discrimination proceeding, or otherwise opposing unlawful discrimination.  Retaliation occurs when an employer, employment agency, or labor organization takes an adverse action against a covered individual because he or she engaged in protected activities. *775 ILCS 5/6-101(A)(2006). (See Exhibits A-P)*

### *Charge F:  Discrimination/Basis:  Religion = Christianity, Religious practices and affiliation*

Francine Y. is a Christian.  She met all of John Marshall's admissions criteria for acceptance into their law school, inclusive of the fact that her low LSAT score was protected by Section 504 of the Rehabilitation Act, allowing for a reasonable accommodation to be made for the plaintiff. On or around Mary 12, 2008, in the afternoon; Francine Y., came to see Dean William Powers. She engaged in the protected activity of complaining to him about the coercion, harassment and retaliation she was experiencing at the hands of Ronald Huberman and Mayor Richard Daley because she would not help them embezzle money out of CTA's claim fund as an absurd remedy to receiving her settlement from a prior lawsuit. In 2004, 2006 and 2007, the plaintiff also

engaged in the protected activities of filing an employment charge of discrimination against the CTA, City of Chicago and the State of Illinois. While communicating with Dean Powers, the plaintiff stated that she refused to embezzle money for Ronald Huberman and Mayor Richard Daley because it was against her religious beliefs and morals. She stated that she was a Christian. The plaintiff also mentioned that she wanted the law school to refund her sixty dollar application fee along with the money order fee and the associated interest if they would not admit her. She mentioned that she had borrowed the money from the United Methodist Church which is across the street from the Daley Center and the facts that she would speak to the pastor and their possible participation as a party to the lawsuit. Because she disclosed her religious beliefs, practices and affiliation, the plaintiff was discriminated against, intentionally ignored and retaliated against in a greater measure by the John Marshall Law School. She was asked in an email not to come to the law school, she wasn't able to speak with Dean Powers, and she was made to stop by the security desk to pick up directives after the John Marshall Law School intentionally broke the law. Also, when the plaintiff came to the law school on June 10, 2008, Dave Martino stopped her at the security desk and asked her to walk down the sidewalk with him. She was harassed off of John Marshall's premises. The plaintiff asked why she had to be walked down the sidewalk. No valid legal explanation or legal documentation was given to the plaintiff validating John Marshall's reason for the religious persecution. The plaintiff asked if she would be allowed to attend the free seminars and conferences after she engaged in the protected activity of complaining about harassment, embezzlement and fraud. Again, she was intentionally ignored. Prior to all actions related to filing this case, the plaintiff was able to enter and exit the John Marshall Law School without any visible signs of discrimination. Before she opposed unlawful discrimination, the plaintiff stopped by the security desk only when attending

conferences located on other levels in the building.  During this time, she was not asked to show any identification or coerced in any way.   Prior to calling Patrick Fitzgerald's office on June 13, 2008, the plaintiff has been deliberately avoided by William Powers; Dean, of the John Marshall Law School and Dave Martino; Safety and Security Manager.    She was lied to and denied the right to receive copies of her admissions documents until she called the FBI on June 13, 2008. On June 20, 2008, the plaintiff was referred to stop by the security desk in order to retrieve her admissions documents.    The abuse and harassment began on or prior to May 12, 2008 and has continued thus far through June 20, 2008.  John Marshall did not give the plaintiff any legal, valid explanation for the continued abuse, harassment, humiliation, defamation and retaliation.

**The Illinois Human Rights Act** *(775 ILCS 5/1-102)* states that it is the public policy of the state of Illinois for:   **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations.  **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State.   **(F) Implementation of Constitutional Guarantees.** To secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970.   **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities

rigorously take affirmative action to provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the public. **(H)** Unfounded Charges. To protect citizens of this State against unfounded charges of unlawful discrimination, sexual harassment in employment and sexual harassment in higher education, and discrimination based on citizenship status in employment. **The 1970 Illinois Constitution, Article I, Section 20: Individual Dignity** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned. *(See Exhibits A-P)*

### *Charge G: Harassment/Basis: Retaliation disclosing religion and religious affiliation*

On or around Mary 12, 2008, in the afternoon; Francine Y., came to see Dean William Powers. She engaged in the protected activity of complaining to him about the coercion, harassment and retaliation she was experiencing at the hands of Ronald Huberman and Mayor Richard Daley because she would not help them embezzle money out of CTA's claim fund as an absurd remedy to receiving her settlement from opposing unlawful discrimination. In 2004, 2006 and 2007, the plaintiff also engaged in the protected activities of filing an employment charge of discrimination against the CTA, the City of Chicago and the State of Illinois. While communicating with Dean Powers, the plaintiff stated that she refused to embezzle money for Ronald Huberman and Mayor Richard Daley because it was against her religious beliefs and morals. She stated that she was a Christian. The plaintiff also mentioned that she wanted the law school to refund her sixty dollar application fee along with the money order fee and the associated interest if they would not admit her. She mentioned that she had borrowed the money from the United Methodist Church

which is across the street from the Daley Center and the facts that she would speak to the pastor and their possible participation as a party to the lawsuit. Because she disclosed her religious beliefs, practices and affiliation, the plaintiff was discriminated against, intentionally ignored and retaliated against in a greater measure by the John Marshall Law School. She was asked in an email not to come to the law school, she wasn't able to speak with Dean Powers in person, and she was made to stop by the security desk to pick up directives after the John Marshall Law School intentionally broke the law. Also, when the plaintiff came to the law school on June 10, 2008, Dave Martino stopped her at the security desk and asked her to walk down the sidewalk with him. She was harassed off of John Marshall's premises. The plaintiff asked why she had to be walked down the sidewalk. No valid legal explanation or legal documentation was given to the plaintiff validating John Marshall's reason for the abuse, harassment and religious persecution. The plaintiff asked if she would be allowed to attend the free seminars and conferences after she engaged in the protected activity of complaining about harassment, embezzlement and fraud. Again, she was intentionally ignored. Prior to and all actions related to filing this case, the plaintiff was able to enter and exit the John Marshall Law School without any visible signs of discrimination. Before she opposed unlawful discrimination, the plaintiff stopped by the security desk only when attending conferences located on other levels in the building. During this time, she was not asked to show any identification or coerced in any way. Prior to and after calling Patrick Fitzgerald's office on June 13, 2008, the plaintiff has been deliberately avoided by William Powers; Dean, of the John Marshall Law School as well as by Dave Martino, Safety and Security Manager. She was lied to and denied the right to receive copies of her admissions documents until she called the FBI on June 13, 2008. On June 20, 2008, the plaintiff was referred to stop by the security desk in an effort to retrieve her admissions

31

documents.    The harassment began on or prior to May 12, 2008 and has continued thus far through June 20, 2008. John Marshall did not give the plaintiff any legal, valid explanation for the continued abuse, harassment, humiliation, defamation and harassment.

John Marshall conspired to keep the plaintiff from becoming an attorney after she complained about engaging in the protected activity of filing a lawsuit against the CTA and the City of Chicago. The John Marshall Law School's adverse actions followed the plaintiff's protected activities within such a reasonable period of time, directly raising the inference of retaliatory motivation. *Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority 06-3107.*

**Title I of the American with Disabilities Act** states that it is unlawful to retaliate against an individual for opposing employment practices that discriminate based on disability or for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding or litigation under the Americans with Disabilities Act.

**The Illinois Human Rights Act** *(775 ILCS 5/1-102)* states that it is the public policy of the state of Illinois for:   **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations.   **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State. **(F) Implementation of Constitutional Guarantees.** To

secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970. **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities rigorously take affirmative action to provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the public. **(H) Unfounded Charges.** To protect citizens of this State against unfounded charges of unlawful discrimination, sexual harassment in employment and sexual harassment in higher education, and discrimination based on citizenship status in employment.

**The 1970 Illinois Constitution, Article I, Section 20: Individual Dignity**  To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned.

The **Title VII Civil Rights Act of 1964** states that an employer may not fire, demote, harass or otherwise "retaliate" against an individual for filing a charge of discrimination, participating in a discrimination proceeding, or otherwise opposing unlawful discrimination. Retaliation occurs when an employer, employment agency, or labor organization takes an **adverse action against a covered individual** because he or she engaged in **a protected activities.** *775 ILCS 5/6-101(A)(2006).  (See Exhibits A-P)*

**_Charge H:  Harassment/Basis: Retaliation for Whistle Blowing, opposing unlawful discrimination and complaining about harassment, coercion, fraud and embezzlement_**

The **Whistleblower Enhancement Protection Act of 2007** prohibits retaliation against public employees who report official wrongdoing.  Francine Y. was an employee with the Chicago

33

Transit Authority in their Capital Investment Department until she was fraudulently separated from service for opposing unlawful discrimination. Because the plaintiff has been afflicted with disabilities that are defined and protected by the **ADA and Section 504 of the Rehabilitation Act**, the statute of limitations have been tolled on her prior employment discrimination case against the CTA, City of Chicago and the State of Illinois. The Whistleblower Act states that "a state or local government entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." The plaintiff, Francine Y., is seeking protection under the Whistleblower Act because she reported fraudulent wrongdoing on behalf of the Chicago Transit Authority, the City of Chicago, the State of Illinois and the John Marshall Law School. The plaintiff also mentioned to William Powers; Dean, of the John Marshall law school that she would bring litigation against the law school. The plaintiff made this statement because she knew that the defendant was breaking the law, so she opposed unlawful discrimination. This information was disclosed to the Federal Bureau of Investigations under the direction or Patrick Fitzgerald's office on June 13, 2008. *H.R. 985*

A federal agency violates the Whistleblower Protection Act if it takes or fails to take (or threatens to take or fail to take) a personnel action with respect to any employee or applicant because of any disclosure of information by the employee or applicant that he or she reasonably believes evidences a violation of a law, rule or regulation; gross mismanagement; gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety. The plaintiff, Francine Y., has experienced several acts of retaliation inflicted upon her by the John Marshall Law School because she complained about engaging in the protected activity of

opposing unlawful discrimination regarding the Chicago Transit Authority and the City of Chicago. On May 12, 2008, the plaintiff complained to William Powers; Dean, of the John Marshall Law School about the harassment and coercion that she was experiencing at the hands of Ronald Huberman and Mayor Richard Daley because she would not help them embezzle money from CTA's claim fund as an absurd remedy to receiving her settlement from the lawsuit. In 2004, 2006 and 2007, the plaintiff engaged in the protected activities of filing an employment charge of discrimination against the CTA, the City of Chicago and the State of Illinois. The plaintiff met all of John Marshall's admissions criteria for acceptance into their law school, inclusive of the fact that her low LSAT score was protected by Section 504 of the Rehabilitation Act, allowing for a reasonable accommodation to be made for the plaintiff. The John Marshall Law School conspired to keep the plaintiff from becoming an attorney after she made the complaints by denying her admission into the John Marshall Law School. The plaintiff also mentioned that The John Marshall Law School had broken the law by refusing to admit her based upon her disclosed psychiatric disabilities which were defined and protected under the Americans with Disabilities Act as well as Section 504 of the Rehabilitation Act. John Marshall conspired along with Ronald Huberman and Mayor Richard Daley to deny her admission into the August 2008 semester. On 6/13/08, the plaintiff engaged in the protected activity of placing a call to the Federal Bureau of Investigations under the direction of Patrick Fitzgerald's office and complaining about the harassment, coercion and intent to fraudulently embezzle and launder money from CTA's claim fund that Ronald Huberman and Mayor Richard Daley was subjecting her to. The acts of retaliation the plaintiff; Francine Y., experienced at the hands of the John Marshall Law School are as follows:

1.) refusal to modify John Marshall's policy to accommodate the plaintiff's disabilities; **2.)** modifying John Marshall's policy to accept an LSAT score in the 140's, but not modifying the policy enough to accommodate the plaintiff's lower LSAT score which was sustained from her disabilities; this was done in an effort to minimize the defendant's damages while simultaneously conspiring to keep the plaintiff from becoming a student at the John Marshall Law School; **3.)** arranging an appointment on 6/5/08 for a meeting between Dean William Powers and the plaintiff to be held on 6/10/08 and canceling the appointment on 6/6/08 when the plaintiff specifically asked if the appointment could be kept because she was homeless, unemployed, financially impoverished and had spent much time walking lengthy distances; **4.)** lying to the plaintiff by telling her that she could not be given a copy of her admissions documents because they were the property of the John Marshall Law School; **5.)** telling the plaintiff to come and pick up a copy of her paperwork after she placed a call to Patrick Fitzgerald's office (FBI) on June 13, 2008 when the law school knew she was unemployed, financially impoverished and homeless; **6.)** giving the plaintiff one, opened $5.00 cta bus pass as a sufficient remedy to cover her transportation expenses, when she disclosed how much she had spent on transportation relating to this ordeal, the fact that she was homeless, financially impoverished and now living in the suburbs, commuting frequently by METRA; instead they required the plaintiff to come to the John Marshall Law School to retrieve her admissions documents when she specifically requested the documents prior to calling the FBI, this imposed a tremendous hardship on the plaintiff, causing her to become more depressed and emotionally wounded, deteriorating her health; the plaintiff practically begged John Marshall for transportation reimbursement and they gave her a one-day, opened CTA bus pass in an effort to minimize their damages because they intentionally broke the law; they gave her the bus pass not because they were trying to help her;

it was given to her based on what they felt she should have been given because she was a homeless, black, disabled female, and a Christian without effective legal representation; this act in an of itself is also fraud; **7.)** telling the plaintiff that the John Marshall Law School could not refund her sixty dollar application fee when the admissions application specifically asked about disclosing an unusual economic disadvantage such as homelessness and financial impoverishment; this was done to intentionally mock, ridicule and further wound the plaintiff as opposed to helping her in her time of need, it was like a slap in the face for the plaintiff; instead the law school profited off the homeless as well as a Christian church; **8.)** telling the plaintiff that she must stop by the security desk to see the security guard when she comes to the law school; however, prior to opposing unlawful discrimination, she never was requested to stop by the security desk; **9.)** telling the plaintiff that she does not need to come by the law school; **10.)** not allowing her to attend free seminars and conferences as she did in the past;  when the plaintiff asked if she would be allowed to attend the free seminars and conferences as she did in the past, via an email conversation, she was ignored and again the defendant remained willfully and consciously indifferent; **11.)** refusing to admit homeless individuals as students into the John Marshall Law School to help produce a heterogeneous student body; Dean Powers never responded when the plaintiff asked "how many applicants who disclosed the fact that they were homeless have you admitted?; **12.)** mocking the plaintiff after she disclosed her disabilities by stating "where is your wheelchair?" **13.)** repeatedly ignoring the plaintiff through willful and c conscious indifference and becoming willfully indifferent;  remaining willfully indifferent through ignorance, small-mindedness and stupidity; **14.)** blowing the whistle on CTA, the City of Chicago, the State of Illinois and the John Marshall Law School.  No valid legal explanation or legal documentation has been given to the plaintiff by John Marshall validating the continued

abuse, harassment, humiliation, defamation and retaliation. The John Marshall Law School's adverse actions followed the plaintiff's protected activities within such a reasonable period of time, directly raising the inference of retaliatory motivation. *Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel and The Chicago Transit Authority 06-3107.*

**Title I of the American with Disabilities Act** states that it is unlawful to retaliate against an individual for opposing employment practices that discriminate based on disability or for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding or litigation under the Americans with Disabilities Act.

**The Illinois Human Rights Act** *(775 ILCS 5/1-102)* states that it is the public policy of the state of Illinois for:  **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations.  **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State. **(F) Implementation of Constitutional Guarantees.** To secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970. **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities

rigorously take affirmative action to provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the public. **(H) Unfounded Charges.** To protect citizens of this State against unfounded charges of unlawful discrimination, sexual harassment in employment and sexual harassment in higher education, and discrimination based on citizenship status in employment.

The **Title VII Civil Rights Act of 1964** states that an employer may not fire, demote, harass or otherwise "retaliate" against an individual for filing a charge of discrimination, participating in a discrimination proceeding, or otherwise opposing unlawful discrimination. Retaliation occurs when an employer, employment agency, or labor organization takes an **adverse action** against a **covered individual** because he or she engaged in **a protected activity.** *775 ILCS 5/6-101(A)(2006).* **The 1970 Illinois Constitution Section** states the following: **Article I, Section 19: No Discrimination Against The Handicapped** All persons with a physical or mental handicap shall be free from discrimination in the sale or rental of property and shall be free from discrimination unrelated to ability in the hiring and promotion practices of any employer. (*See Exhibits A-P*)

**Charge I:  Defamation of Character/Basis:  Public Service Official and future U.S. Attorney**

Defamation of character is a false and unprivileged spoken word or written publication which exposes any living person to hatred, contempt, ridicule, or which causes him/her to be shunned or avoided, or which has a tendency to injure him/her in his/her trade or occupation. The plaintiff, Francine Y., is a public service official because she worked in the Capital Investment office of the Chicago Transit Authority. Because of her disabilities, the statute of limitations have been tolled on the case that she filed against the Chicago Transit Authority and

the City of Chicago. She expects to win her case and return to work as a public service official. William Powers, Dean, of the John Marshall Law School gave the plaintiff directions in an email not to come by the law school. He also canceled the meeting he had made with her stating that he had nothing else to impart. The plaintiff opposed unlawful discrimination and engaged in the protected activity of complaining about the harassment, sexual harassment and coercion to fraudulently embezzle money from CTA's claim fund that she was experiencing and the hands of Ronald Huberman and Mayor Richard Daley. Apparently, Dean Powers or one of his superiors gave verbal and/or written instructions to the staff members at the John Marshall Law School to retaliate against the plaintiff. These instructions defamed the plaintiff's reputation. Also, William Powers started hiding from the plaintiff and used Dave Martino; Safety and Security Manager to abuse, harass, humiliate, defame and retaliate against Francine Y. This is evident because the plaintiff began to be treated differently as if she was a dangerous, black criminal that would inflict harm on others. The John Marshall Law School defamed the plaintiff's character and reputation as a public service official an a high-powered U.S. attorney when she went to the law school to meet with Dean Powers on June 10, 2008. Dave Martino, Security and Safety Manager for the John Marshall law school stopped the plaintiff at the security desk and told her to walk with him down the street. She was harassed off of John Marshall's premises. The plaintiff asked why she had to be walked down the sidewalk. No valid legal explanation or documentation was given to the plaintiff validating John Marshall's reason for their discriminatory treatment and the fact that the plaintiff was defamed by being treated as if she was a crazy, black female with psychotic disorders along with criminal intentions to inflict harm upon others. The plaintiff asked if she would be allowed to continue to attend John Marshall's free seminars and conferences. She was intentionally ignored. Francine Y. became deeply

wounded, offended and severely humiliated by the way John Marshall was treating her. She was treated as a black, violent criminal who would inflict harm on others. This act of defamation was intentional, reckless and done with malice because the John Marshall Law School made an appointment to meet with the plaintiff on June 10, 2008 and the day after she was given the appointment through visible contact in their office, Dean Powers canceled the appointment for no apparent reason. She was also given a statement in an email that she should not come back to the law school. The defamation of character was implied through the defendant's willful and conscious indifference to help her, their intentional discrimination and their willful actions along with discriminatory email directions. This harmed the plaintiff because she became more depressed and emotionally wounded than she was before the discrimination occurred. While leaving the law school, others were watching. Olga; a John Marshall Law School employee, saw the plaintiff walking down the sidewalk near the school. Olga began to walk on the very edge of the sidewalk as she approached the plaintiff, making it appear that she was avoiding a dangerous, homeless, African-American, fat, female criminal. This act of retaliation by Olga; a John Marshall Law School employee, created an offensive scene and hostile environment for the plaintiff. Her credibility became tainted and greatly diminished. Her reputation as a public service official and high powered, unchallenged soon-to-become attorney was damaged and defamed as well. *New York Times Co. v. Sullivan, 376 U.S. 254 (1964). (See Exhibits A-P)*

### *Charge J: Intentional & Negligent Intentional Infliction of Emotional and Mental Distress*
William Powers, along with the committee which reviewed the applicant's application for admission committed the workplace torts of intentional infliction of emotional distress, intentional infliction of mental distress and negligent intentional infliction of emotional and mental distress upon the plaintiff. A reckless disregard for the likelihood of causing the plaintiff

distress occurred when the plaintiff was wrongfully denied access into John Marshall Law School because she opposed unlawful discrimination, complained about it and disclosed her disabilities to William Powers; Dean, of the John Marshall Law School on or around May 12, 2008. The plaintiff; Francine Y., was outraged when she was being denied access into the John Marshall Law School for fraudulent reasons mixed with the intent to conspire against her. Francine Y. was vulnerable because she was a woman who was disabled and William Powers; Dean, of the John Marshall Law School knew it. More than likely, he passed this information along to the other members of the committee within the John Marshall Law School which makes entrance decisions. Lastly, Mr. Powers along with the admissions committee owed the plaintiff the fiduciary responsibility and duty of giving her admissions application a correct, just and ethical evaluation based on all disclosed information. These actions, subsequent actions and all other actions that followed made the plaintiff's emotional and mental distress greater than it was from the beginning. It became worse as she returned to her traumatic, homelessness living environment, with the threat of Chicago police officers belittling, harassing, stalking and keeping the plaintiff under heavy surveillance. The plaintiff was arrested on May 26, 2008 and a police officer also poisoned her which was an act of attempted murder. She disclosed the fact that she was falsely arrested and charged with a battery to William Powers. She was released and the arresting officers did not appear in court causing the charge to be stricken off with a leave to reinstate. The plaintiff is in the process of having the erroneous charged expunged from her record because she never committed and act of battery against anyone in May 26, 2008.

A principle difference between working in an occupation and practicing a profession is the fiduciary responsibility that comes with that profession. A fiduciary is a person or group of people who stand in a position of trust. That trust represents a significant obligation to care for

the interests of others. Inherent in practicing as an attorney is the fiduciary responsibility that an authoritative person or group of persons in charge accept, placing the interests of others above themselves. An agent is a person or group of persons who perform an act for another. Inherent in this act is fiduciary responsibility and dual agency, which can also be referred to as mixed agency. This is a situation where a person/authoritative figure performs or acts for two others. The two people involved are the client and the entity the agents are employed with. William Powers and the committee which makes the admission decisions failed as an agents acting on behalf of the John Marshall Law School. They did not fulfill their fiduciary responsibilities to the plaintiff; Francine Y., or to The John Marshall Law School. Their intent to outwardly deceive, inflict pain and break the law was intentional and deliberate. It was also done with malice. They placed their own interests above the interests of an innocent, disabled, homeless, African-American, Christian woman. They were skilled in the law, but took no measure to use the law to protect, defend or assist the plaintiff. The plaintiff; Francine Y., needed their help more than anything else. (*See Exhibits A-P*)

### *Charge K: Fraud and Fraudulent Policies*

Fraud, in addition to being a criminal act, is also a type of civil law violation known as a tort. A tort is a civil wrong for which the law provides a remedy. A civil fraud typically involves the act of intentionally making a false representation of a material fact, with the intent to deceive, which is reasonably relied upon by another person to that person's detriment. A "false representation" can take many forms, such as: a false statement of fact, known to be false at the time it was made; a statement of fact with no reasonable basis to make that statement; a promise of future performance made with an intent, at the time the promise was made, not to perform as promised;

a statement of opinion based on a false statement of fact; a statement of opinion that the maker knows to be false; or an expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion. "Special knowledge" in this case means knowledge or information superior to that possessed by the other party, and to which the other party did not have equal access.

On May 12, 2008; Francine Y., complained to the John Marshall Law School about the harassment and coercion she was experiencing by Ronald Huberman and Mayor Richard Daley because she would not embezzle money from them from CTA's claim fund as an absurd remedy to receiving her settlement from a prior employment discrimination lawsuit. They also wanted her to launder the money for them into a remote, off-shore bank or hold on to their embezzled portion within her private accounts. Money Laundering is a violation of *720 ILCS 5/29B-1* and Insurance Fraud is governed by *720 ILCS 5/46-1. (See Exhibits A-P)*

In the case of *Francine Yates v. The Illinois Department of Human Rights, the Chief Legal Counsel and the Chicago Transit Authority*, the defendants used vicious lies, fraudulent employment practices and the admission of fraudulent medical documents as substantial evidence. Paul Fish; CTA's Vice President of Capital Investment, placed a memorandum dated November 14, 2003 in the plaintiff's file without her knowledge or consent. The memo stated that the plaintiff was exhibiting a growing degree of a mental psychotic condition known as paranoia.    The plaintiff is not mentally ill as perceived by Paul Fish and Paul Fish is not a doctor. His motive for retaliating against the plaintiff and diagnosing her with a psychotic condition stems from the fact that he has knowledge of federal and state funds that are being embezzled from capital dollars used to fund CTA's capital improvement projects. Before Paul

Fish came on board with the CTA, he worked for the RTA which is a board that directs how government funds are to spent at CTA, PACE and METRA.

Paranoia is often associated with psychotic illnesses, particularly schizophrenia, although attenuated features may be present in other primarily non-psychotic diagnoses, such as paranoid personality disorder. **Paranoia** is a disturbed thought process characterized by excessive anxiety or fear, often to the point of irrationality and delusion.    Schizophrenia is the medical condition that the plaintiff was diagnosed as having by Dr. Angulo, a doctor who works for the CTA. The plaintiff disclosed to William Powers; Dean, of the John Marshall Law School that CTA had fraudulently diagnosed her with psychotic conditions that she does not have. Dr. Angulo is not a psychiatrist nor did he examine the plaintiff for any mental illness. The plaintiff; Francine Y., has never been diagnosed or afflicted with paranoia or schizophrenia.   The defendants were trying to have her removed from society and committed into a mental institution. *Cruzan v. Missouri Department of Health, 497 U.S. 261, 278 (1990)*.

CTA had several employees conspiring against the plaintiff because she had knowledge of all the money that has been embezzled out of their pension fund as well as through the capital budgeting contracts. The John Marshall Law School also receives federal funding.  Maybe the underlying reasoning for the retaliation is the prima facie fact that they are trying to cover up wrong doing or the fact they have been accomplices with the City and the State in the act of embezzlement which is fraud.  However, the conspirators were doing a very poor job of working together. Paul Fish's erroneous perception of the plaintiff as a mentally disabled employee, his willful intention to commit fraud and all other actions relating to such helped to increase the company's liability

associated with this case.   The defendants had no legal remedies that they could use in a court of law, so they resorted to fraud and fraudulent activities in lieu of an equitable defense.

On June 9, 2008, the John Marshall Law School sent the plaintiff, Francine Y., an email stating that admissions application materials are retained by the law school and are not returned to the applicants.  This is an act of fraud because William Powers is an attorney who should be skilled in the law as well as the policies of the John Marshall Law School.  The statement was false, known by him to be false at the time it was made and used to deceive a homeless, disabled African-American, Christian woman who had no effective legal representation.  This is a blatant lie and it is also perjury.  After the plaintiff called Patrick Fitzgerald's office on June 13, 2008, the John Marshall Law School must have received a phone call from the Federal Bureau of Investigations.  This is evident because on June 16, 2008, the plaintiff received an email stating that she was able to come to the John Marshall Law School to pick up her admissions application documents.  Francine Y.; the plaintiff, came to the John Marshall Law School on June 20, 2008 to pick up her admissions documents for the winter and fall semesters of 2008.  Neither William Powers nor Dave Martino; Security and Safety Manager, was in the immediate vicinity.  The security guard went into Dave's office, retrieved the package and gave the plaintiff her package. Also, because the plaintiff was sent an email stating that the documents could not be given to her, this email needs to be admitted in court as substantial evidence for the charges of fraud and perjury.  **Perjury** is the act of lying or making verifiably false statements on a material matter in a court of law or in any of various sworn statements in writing. It is important that the false statement be material to the case at hand—that it could affect the outcome of the case. Perjury is considered a serious offense as it can be used to usurp the power of the courts; resulting in miscarriages of justice; or as in the case of 06-3107, overt abortions of justice.  In the United

States, the general perjury statute under Federal law provides for a prison sentence of up to five years, and is found at *18 U.S.C. 1621, 28 U.S.C. 1746.*    815 ILCS 505 *Consumer Fraud and Deceptive Business Practices Act.*

The John Marshall Law School has also violated several of their own student handbook policies. Their student handbook is a legally binding document. It is also a contract with contractural obligations. The student handbook policy for the year of 2007-2008 states on page one that Dean William Powers has the responsibility to serve the needs of students in every possible way. This a written statement contained within the policy along with his signature. As a disabled applicant, the plaintiff; Francine Y., needs were not fully served. He also stated on page one that his door would be open and that his concerns would be addressed. This is fraud because after the plaintiff complained about opposing unlawful discrimination, the John Marshall Law School started retaliating against the plaintiff and Dean Powers did not make himself available to see the plaintiff or answer any of her future concerns and questions.

Secondly, the handbook discusses on pages ten through eleven that only between 20% - 30% of the students enrolled within certain classes will be given grades of A+, A, A-, B+, B, B-, etc. This is a fraudulent policy because it has a lot of room for an instructor's biases, prejudices, favoritism and stereotypes to be used as a deciding factor as to which student is to receive which grade. What if all the students in a Civil Procedure I class were performing consistently and their demonstrated, continuous achievement was substantiated by their performance on John Marshall's exams? How can an instructor decide which percentage of these students should receive the grade of A, B, or C, etc. unless they use a fraudulent policy or their own personal biaes to make the decision.

47

Lastly, on page twelve of John Marshall's handbook, the school's disability policy states that John Marshall works with the students to accommodate their individual needs. The plaintiff, Francine Y., was intentionally ignored and denied entrance into the Fall 2008 semester. The handbook also discusses the school's harassment, discrimination and non-retaliation policies on pages fifty-eight and fifty-nine. John Marshall has created these policies in conjunction with the law, but have blatantly ignored and violated their own policies. On page sixty, the handbook discusses the assistance of a disabled person in the event of a safety evacuation. The policy states that a disabled person is to be asked how someone can assist them if they need to evacuate the building. The law school should have established procedures for evacuating disabled persons in emergency situations. The disabled person may not know how they should be best assisted given the tension associated with an emergency. The disabled may be left behind, intentionally ignored or get trampled to death in an emergency situation. In the 2003 fire in the Cook County Administration building, one disabled person was not able to escape the fire because his disability required the use of a wheelchair, thereby limiting his mobility. Also, John Marshall has an absence of security personnel available throughout the school. Security personnel which have been effectively trained and qualified should be readily available and accessible to help at all times. Again, John Marshall has demonstrated through its own policy that the law school is not genuinely concerned about workplace safety and persons with disabilities. They have created policies which they do not abide by, resulting in unnecessary liabilities for the law school which have their origin in fraud. Their actions have produced prima facie evidence of their intentional and willful indifference to ignore laws which govern them as an educational institution.

The plaintiff was falsely arrested on May 26, 2008 by Chicago police officers under the direction of Ronald Huberman and Mayor Richard Daley. She was released on an I-bond for a battery that she did not commit.

She made an appearance in court on July 9, 2008 and the police officers did not show up causing her case to be stricken off with leave to reinstate. The plaintiff is in the process of having the charge of battery, which she did not commit, expunged from her record. She mentioned this to William Powers; Dean, of the John Marshall Law School. The John Marshall Law cannot use the false arrest as an act of retaliation and another fraudulent reason to deny the plaintiff further admission into their law school. She disclosed the false arrest to William Powers in June of 2008 and stated that she never committed the battery that she was charged with. The case number is 08123628501. After the plaintiff's release from prison, she place a call to the FBI, under the direction of Patrick Fitzgerald's office because this case has escalated into a high profile case. A principle difference between working in an occupation and practicing a profession is the fiduciary responsibility that comes with a profession. A fiduciary is a person or group of people who stand in a position of trust. That trust represents a significant obligation to care for the interests of others.

Inherent in practicing as an attorney or authoritative figures in a law school is the fiduciary responsibility that an authoritative person or group of persons in charge accept, placing the interests of others above themselves. An agent is a person or group of persons who perform an act for another. Inherent in this act is fiduciary responsibility and dual agency, which can also be referred to as mixed agency. This is a situation where a person/authoritative figure performs or acts for two others. The two people involved are the client and the entity the agents are employed with. William Powers and the committee which makes the admission decisions failed

as an agents acting on behalf of the John Marshall Law School.    They did not fulfill their fiduciary responsibilities to the plaintiff, Francine Y., or to The John Marshall Law School. Their intent to outwardly deceive, inflict pain and break the law was intentional and deliberate. They placed their own interests above the interests of an innocent, ill homeless, African-American woman.  They were skilled in the law, but took no measure to use the law to protect, defend or assist the plaintiff.  The plaintiff, Francine Y., needed their help more than anything else.

[2]**Disbarment** is a revocation of an attorney's right to practice law and argue cases.  Generally, disbarment is imposed as a sanction for conduct indicating that an attorney is not fit to practice law, willfully disregarding the interests of a client, or engaging in fraud which impedes the administration of justice.  The admissions committee of the John Marshall Law School, willfully disregarded the interests of the plaintiff and engaged in fraud while doing so.  To be disbarred is considered a great embarrassment and shame, even if one no longer wishes to pursue a career in the law.  Because the defendants committed the civil torts of fraud, intentional infliction of

---

[2] **Notable disbarments**

Former Vice President Spiro Agnew, having pleaded no contest (which subjects a person to the same penalties as a guilty plea) to charges of bribery and tax evasion, was disbarred from Maryland, the state of which he had previously been governor.

Former President Richard Nixon was disbarred from New York in 1976 for obstruction of justice related to the Watergate scandal.

In 2001, former President Bill Clinton resigned from the Supreme Court bar rather than face near-certain disbarment. In a separate, but related action, the Arkansas bar moved to disbar Clinton, but offered a deal that saw him suspended for five years. Because he was allowed to reapply to the bar after the suspension ended in 2006, his punishment is not considered disbarment. Because disbarment is not always permanent, his punishment was functionally identical to disbarment.

In 2007, Mike Nifong, the District Attorney of Durham County, North Carolina who presided over the 2006 Duke University lacrosse case, was disbarred for prosecutorial misconduct related to his handling of the case

emotional distress, intentional inflectional of mental distress as well as negligent intentional infliction of emotional and mental distress, the act of disbarment should be imposed as a sanction for conduct indicating that an attorney or group of attorneys; in this case, are not fit to practice law. They willfully disregarded the interests of a client, engaging in fraud which impeded the administration of justice. Since the plaintiff; Francine Y., has been subjected to shame, embarrassment, indignity and disgrace, this judicial penalty is an effective remedy along with the other damages to help make the plaintiff whole. The plaintiff is asking that everyone on the committee be disbarred and separated from service with the John Marshall Law School for intentionally breaking the law an impeding justice. The plaintiff has a fiduciary responsibility to the United States legal system to protect and defend the constitutional and legal rights of its citizens as a legal practioner. *(See Exhibits A-P)*

A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. *28 C.F.R. § 35.130(d).*

### III. CONCLUSION

The plaintiff; Francine Y., was intentionally discriminated against by the John Marshall Law School because she opposed unlawful discrimination. The law school's intent to do so was reckless, malicious and overwhelmingly destructive. John Marshall was in a position of power. They knew the plaintiff was a homeless, disabled, African-American, Christian woman without effective legal representation. John Marshall took advantage of the situation just the way the Chicago Transit Authority and the City of Chicago did. However, the plaintiff took a stand in the face of adversity and opposed unlawful discrimination, enduring a great deal of persecution. The John Marshall Law School was in a position to help the plaintiff; however, they chose to break the law by intentionally ignoring the plaintiff's complaints, violating her rights and aiding,

abetting and obstructing justice. This case should be an embarrassment, a shame and a disgrace to the John Marshall Law School because an educational institution which seeks to instruct in the law has intentionally broken the law. Francine Y., the plaintiff, is asking for a summary judgment to be rendered in favor of the plaintiff with no appeals granted on behalf of the defendant. The plaintiff is also seeking relief from the trial courts in the form of the following remedies: injunctive relief, all harassers to be disciplined and separated from service, disbarment, damages for mental anguish/mental cruelty, psychological & emotional pain from suffering, shame, indignity, disgrace, embarrassment, humiliation, demoralization, anger, discomfort, inconvenience, delay, worry, distress, anxiety, stress, malice, oppression, conscious indifference, willful indifference, deep depression, homelessness & side affects, feelings of sorrow, torment, powerlessness and exclusion, future continued indefinite suffering, damages for intentional infliction of emotional and mental distress, damages for negligent intentional infliction of emotional and mental distress, damages for a diminished quality of life, loss of opportunity potential, attorney fees, expert witness fees, punitive damages, pecuniary/non-pecuniary damages, enrollment in the John Marshall Law School, reimbursement of all fees, tuition and living expenses associated with attendance in the John Marshall Law School, all workplace torts, damages for fraud & conspiracy to commit fraud, all actions enabling the applicant to be made whole, all other compensatory damages.

## PROOF OF SERVICE

I certify that I served one copy of the attached brief by hand delivery, directed to the person named on the Notice of Filing and listed below at the address indicated on July 21st, 2008

The John Marshall Law School
Attn: William Powers
315 S. Plymouth Court
Chicago, IL 60604

_Francine Yates_
Francine Yates, Pro Se

# APPENDIX

This disability notice must be filled out immediately. Return to Sedgwick CMS, P.O. Box 803947, Chicago, IL 60680-3947. It is your duty to notify your immediate supervisor on your first day off. On your second day off, notify your work location and Sedgwick (312) 759-2282.

**ATTENTION:**     Your claim benefits will not start until you are under the care of a licensed provider.

**\* IMPORTANT:**     This form is not to be used if sickness or injury is due to an injury on duty or recurrence of same.

## BOTTOM PORTION MUST BE COMPLETED BY LICENSED PROVIDER

**Name:** YATES, FRANCINE   (Last / First)   **Middle:** N/A   **Married:**

**Address:** 15439 S. DORCHESTER, UNIT # 2F, DOLTON IL 60419   (Number / Street / City Town / Zip Code)   **Phone Number:** (708) 841-5612

**Age:** 35   **Occupation – Type of Work:** FINANCIAL ANALYST 3   **Badge/Payroll Number:** 41648   **Social Security Number:** 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

**Department:** CAPITAL INVESTMENT   **Location:** 222 MERCHANDISE MART Plaza Chicago IL   **Union:** YES / N/A - EXEMPT EMPLOYEE

**Describe Type of Sickness or Injury:** MAJOR DEPRESSION AND ANXIETY   **Injured on Duty:**

**First Day Unable to Work:** Wednesday 11/26/03   (Month / Day / Year)

**Name of Provider Attending:** KUMAR MOOLAYIL   **Phone Number:** (708) 596-5622

**Address:** 15425 S. PARK #102 South Holland, IL 60473   (Number / Street / City Town / Zip Code)

/////////////////////////////////////////////////////////////////////////////////////////

**To be completed by Employee**

**AUTHORIZATION TO RELEASE INFORMATION:** I hereby authorize the undersigned provider to release any information acquired course of my examination or treatment to the CTA's Medical Director, Sedgwick CMS, Blue Cross/ Blue Shield and ComPsych to rele: CTA information necessary for the payment of Weekly Indemnity Benefits.

**Signed:** Francine Yates   **Date:** 12/7/03

/////////////////////////////////////////////////////////////////////////////////////////

**TO BE COMPLETED BY LICENSED PROVIDER IMMEDIATELY AND RETURNED TO SEDGWICK CMS, P.O. BOX 803947, CHICAGO, ILLINOIS 60680-3947**

**Patient's Name:** FRANCINE YATES

**First day evaluated for present condition:** 12/2/03

**Diagnosis/ Presenting Issue:** Major depression and anxiety   **ICD 9 Code:** 296.23

**Surgery (if applicable include date):**

**Treatment Plan (including meds):** Klonopin 0.5 mgm po BID / Lexapro 10 mg po QD

**What symptoms are preventing the patient from returning to work?:** anxiety / depression / difficulty being around people.

**Duration of disability?:** approximately 12 wks.

**Next Office visit date (if applicable):** 12/29/03

**Signed:** [signature]   MD.

**Date:** 12/15/03

**\* Provider Name:** KUMAR MOOLAYIL

**\* Provider Address:** 15475 S. PARK #102 S. Holland IL 604...

**\* Provider Phone Number:** 708 596 2211   **\* Provider Fax Number:** 708 596 5622   **Professional Designation:**

* Additional contact may be necessary

# THE JOHN MARSHALL LAW SCHOOL
### AT WORK · IN CHICAGO

Application for Admission

**Term**  Fall 20 ___  YY

Do not write in this space

PC _____   Date ____
Final _____

| Program: | ☒ Full-time | ☐ Part-time day | ☐ Part-time evening |
|---|---|---|---|
| Status: | ☒ Entering | ☐ Transfer | |
| Degree Objective: | ☒ JD | | |

**Application Fee:** $60.00 (make check payable to The John Marshall Law School)
Send all materials to: Office of Admission, The John Marshall Law School, 315 South Plymouth Court, Chicago, Illinois 60604

**Please Type or Print in Ink**

1. Yates                    Francine
   _Last Name_           _First Name_           _Middle Name_           _Previous Surname (if applicable)_

2. Social Security Number: 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     or LSAC Account Number: L 2 8 0 7 4 1 1 3

3. Gender: ☐ Male  ☒ Female

4. Current Mailing Address: 1458 S. Canal Street
   Chicago                 IL            60607
   _City_                 _State_        _ZIP_
   (312) 351-5635          beyondtheregular@yahoo.
   _Phone_                 _E-mail_
   (312) 351-5635
   _Cell number_

5. Permanent Address: N/A
   _City_                 _State_        _ZIP_
   _Phone_                 _E-mail_
   (Please indicate the date this address becomes effective. Correspondence will be sent to
   this address based on the date provided.) N/A
   _MM/DD/YY_

6. Date of Birth: 5/26/1968     7. Place of Birth: Blue Island     IL     USA
   _MM/DD/YY_                    _City / State / Country_

8. Country of Citizenship: ☒ USA  ☐ Other _____
   If Other, are you a permanent resident of the USA? ☐ Yes  ☐ No

9. Have you previously applied for admission to this school? ☒ No  ☐ Yes; when? _____
   _MM/YY_
   Application was: ☐ accepted  ☐ denied
   ☐ conditional or summer qualifying program     ☐ canceled     ☐ other _____

10. If accepted, did you register?  ☐ No  ☐ Yes; date _____
    _MM/YY_
    Did you attend class?  ☐ No  ☐ Yes; dates of attendance _____
    _MM/YY-MM/YY_

11. When did you or will you take the LSAT?     Date 09/07  _MM/YY_   Score _____
    (Scores more than five years old are not accepted.)   Date 12/07  _MM/YY_   Score _____

12. List names of all colleges, universities and graduate schools you have attended or will attend prior to date of admission to this law school.

| NAME OF COLLEGE OR UNIVERSITY (list most recent first) | LOCATION City/State | Dates of Attendance from MM/YY to MM/YY | MAJOR | DEGREE | DATE OF DEGREE MM/YY |
|---|---|---|---|---|---|
| Robert Morris College | | | Computerized | AAS | 04/90 |
| DePaul University | | | Finance | BS | 06/95 |
| Keller Graduate School Of | | | Business | MBA, MPM | 06/00, |
| Keller Graduate School Of | | | Human | MHRM | 09/02 |

13. Title IV of the Civil Rights Act of 1964 requires that the law school report ethnic and racial data to the United States Department of Education. (Your response is voluntary.)
    ☐ 1. American Indian/Alaskan Native   ☐ 5. Hispanic
    ☒ 2. Black/African American          ☐ 6. Asian/Pacific Islander
    ☐ 3. Caucasian/White                 ☐ 7. Puerto Rican
    ☐ 4. Chicano/Mexican American        ☐ 8. Other

14. The law school seeks a heterogeneous student body, taking into account in its admission process such factors as ethnic and cultural background, sexual orientation, unusual economic disadvantage and geographic origin. If any such factors are of special relevance to your application, list here or attach a separate sheet or electronic attachment:

    I am currently a homeless individual.

15. Summary of employment, past and present (most recent first), including during college (use a separate sheet or electronic attachment if necessary, or submit a résumé).

| FROM (MM/YY) | TO (MM/YY) | NAME AND ADDRESS OF EMPLOYER | POSITION HELD | REASON FOR LEAVING |
|---|---|---|---|---|
| 03/02 | 06/04 | Chicago Transit Authority | Senior Capital | Corporate Down- |
| 01/98 | 12/00 | SBC - Ameritech | Expert Technical | Returned to |
| 11/87 | 07/96 | Harris Trust & Savings Bank | Benefit Payment | Corporate Down- |

16. **PERSONAL STATEMENT** (Required of all applicants. Submit 2 to 4 pages, typed double-spaced.) Please provide any additional information about yourself or your experiences which you feel may support your admission to law school, including why you wish to enter the legal profession. The personal statement may be electronically attached.

EXHIBIT B

# THE JOHN MARSHALL LAW SCHOOL
### AT WORK · IN CHICAGO

Application for Admission

Term　Fall 20 08
　　　　　　YY

| | | | | Do not write in this space |
|---|---|---|---|---|
| Program: | ☒ Full-time | ☐ Part-time day | ☐ Part-time evening | PC _____ Date _____ |
| Status: | ☒ Entering | ☐ Transfer | | Final _____ |
| Degree Objective: | ☒ JD | | | |

Application Fee: $60.00 (make check payable to The John Marshall Law School)
Send all materials to: Office of Admission, The John Marshall Law School, 315 South Plymouth Court, Chicago, Illinois 60604

**Please Type or Print in Ink**

1. Yates　　　　　　　Francine
   Last Name　　　　　First Name　　　　　Middle Name　　　　Previous Surname (if applicable)

2. Social Security Number: 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　　or LSAC Account Number: L 2 8 0 7 4 1 1 3

3. Gender: ☐ Male　☒ Female

4. Current Mailing Address: 1458 S. Canal Street　　　　5. Permanent Address: _____
   Chicago　　　IL　　　60607
   City　　　State　　ZIP　　　　　　　　　　City　　　State　　ZIP
   (312) 351-5635 (email access　serenityfaythe@yahoo.
   Phone　　　　　　　E-mail　　　　　　　　Phone　　　　　　E-mail
   (312) 351-5635 (email access only)
   Cell number　　　　　　　　　　　　　(Please indicate the date this address becomes effective. Correspondence will be sent to
   　　　　　　　　　　　　　　　　　　this address based on the date provided.) N/A
   　　　　　　　　　　　　　　　　　　　　　　　　　　　MM/DD/YY

6. Date of Birth: 5/26/1968　　7. Place of Birth: Blue Island　　IL　　USA
   MM/DD/YY　　　　　　　　　　　　　　　　　City / State / Country

8. Country of Citizenship: ☒ USA　☐ Other _____　If Other, are you a permanent resident of the USA? ☐ Yes　☐ No

9. Have you previously applied for admission to this school? ☐ No　☒ Yes; when? 12/1/2007
   　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　MM/YY
   Application was: ☐ accepted　☐ denied
   ☐ conditional or summer qualifying program　☐ canceled　☒ other never looked

10. If accepted, did you register? ☐ No ☐ Yes; date _____　Did you attend class? ☐ No　☐ Yes; dates of attendance _____
    　　　　　　　　　　　　　　MM/YY　　　　　　　　　　　　　　　　　　　　　　　MM/YY-MM/YY

11. When did you or will you take the LSAT?　Date 12/1/2007 MM/YY　Score 131
    (Scores more than five years old are not accepted.)　Date 10/1/2007 MM/YY　Score 130

12. List names of all colleges, universities and graduate schools you have attended or will attend prior to date of admission to this law school.

| NAME OF COLLEGE OR UNIVERSITY (list most recent first) | LOCATION City/State | Dates of Attendance from to MM/YY MM/YY | MAJOR | DEGREE | DATE OF DEGREE MM/YY |
|---|---|---|---|---|---|
| Keller Graduate School Of | Chicago, IL | 02/99 - 09/02 | Human | MHRM | 9/02 |
| Keller Graduate School Of | Chicago, IL | 02/99 - 11/01 | Project | MPM | 6/00 |
| Keller Graduate School Of | Chicago, IL | 02/99 - 06/00 | Business | MBA | 6/99 |
| De Paul Univ | Chicago, IL | 09/91 - 06/95 | Finance | BS | 06/95 |

13. Title IV of the Civil Rights Act of 1964 requires that the law school report ethnic and racial data to the United States Department of Education. (Your response is voluntary.)
   ☐ 1. American Indian/Alaskan Native
   ☒ 2. Black/African American
   ☐ 3. Caucasian/White
   ☐ 4. Chicano/Mexican American
   ☐ 5. Hispanic
   ☐ 6. Asian/Pacific Islander
   ☐ 7. Puerto Rican
   ☐ 8. Other

14. The law school seeks a heterogeneous student body, taking into account its admission process such factors as ethnic and cultural background, sexual orientation, unusual economic disadvantage and geographic origin. If any such factors are of special relevance to your application, list here or attach a separate sheet or electronic attachment:

   I am currently unemployed and homeless.

15. Summary of employment, past and present (most recent first), including during college (use a separate sheet or electronic attachment if necessary, or submit a résumé).

| FROM (MM/YY) | TO (MM/YY) | NAME AND ADDRESS OF EMPLOYER | POSITION HELD | REASON FOR LEAVING |
|---|---|---|---|---|
| 03/02 | 06/04 | Chicago Transit Authority, Chicago, IL | Sr. CIP Project Analyst | Corporate Down- |
| 01/98 | 12/00 | SBC - Ameritech , Chicago, IL | Expert Technical | Returned to School |
| 11/87 | 06/96 | Harris Bank , Chicago, IL | Benefit Payment | Corporate Down- |

16. **PERSONAL STATEMENT** (Required of all applicants. Submit 2 to 4 pages, typed double-spaced.) Please provide any additional information about yourself or your experiences which you feel may support your admission to law school, including why you wish to enter the legal profession. The personal statement may be electronically attached.

Francine Yates
LSAC # L28074113

I am attaching an additional statement as supplemental information in support of my application package. This statement serves to explain why my LSAT score is not as high as it should have been. I took the LSAT in October of 2007 and December of 2007. My scores were 130 and 131 respectively.

I have been living as a homeless person within a homeless environment for over two years. I experienced a corporate down-sizing in the year of 2004. Because the economy is in a recessionary state, it has been difficult for me to obtain suitable employment to sustain my previous living conditions. Eventually, I found another cyclical job which employed me with less than forty working hours per week. However, the tangible benefits from that job did not yield enough income to help move me pass homelessness. I was laid off of this job in March of 2007 because the work slowed down and some employees were not needed.

Living within a depressed environment and trying to focus on the LSAT has been extremely stressful for me. Also, the holiday season was another underlying contributing factor which added an even greater amount of additional stress to my life.

With all of these collaborative stressors at work, studying for the LSAT, being homeless, living within a depressed environment and the holiday season itself, the adverse effect of me receiving a very low LSAT score was inevitable. Lastly, my true performance can be accurately measured through various university program curriculums as opposed to one raw score derived from a university admission test such as the LSAT. If you have any additional questions or concerns, please feel free to contact me by email only. My email address is serenityfaythe@yahoo.com

Ms. Yates,

I have your copies of the paperwork you requested.  Please let me know when you will be here to pick them up.

Thanks,

Dave Martino, CPP
Security & Safety Manager
The John Marshall Law School
315 S. Plymouth Ct.
Chicago, Il 60604
(312)427-2737 x.339

EXHIBIT E

Dear Ms. Yates:

I am afraid that we are unable to admit you. If you can pull your LSAT score into the mid 140s, you would have a much better chance.

Sincerely,

William B. Powers
Associate Dean for Admission and Student Affairs
The John Marshall Law School
315 South Plymouth Court
Chicago, Illinois 60604
6powers@jmls.edu

www.jmls.edu

**From:** Scott, Olga
**Sent:** Friday, May 30, 2008 1:59 PM
**To:** Powers, William
**Subject:** FW: LAW SCHOOL APPLICATION FOR AUGUST 2008

**From:** Harmoney Ubanks [mailto:]
**Sent:** Saturday, May 24, 2008 10:11 AM
**To:** Scott, Olga
**Subject:** Fw: LAW SCHOOL APPLICATION FOR AUGUST 2008

hello, OLGA! MY NAME IS FRANCINE YATES. I CAME IN TO SEE YOU ON FRIDAY, MAY 23, 2008. I ASKED TO SPEAK WITH MR. POWERS, BUT YOU TOLD ME THAT HE WAS OUT OF THE OFFICE, ATTENDING A CONFERENCE AND THAT HE WOULD NOT BE BACK UNTIL JUNE 2, 2008. THIS IS THE EMAIL THAT I FORWARDED HIM. CAN YOU PLEASE TRY CONTACTING HIM VIA PHONE FOR ME AND HAVE HIM EMAIL ME WITH A RESPONSE AS SOON AS POSSILBE. I HAVE ENCLOSED MY EMAIL ADDRESS IN THIS EMAIL AS WELL. THANKS!

----- Forwarded Message ----
From: Harmoney Ubanks <harmoneyluv@yahoo.com>
To: 6powers@jmls.edu
Sent: Saturday, May 24, 2008 9:07:21 AM
Subject: LAW SCHOOL APPLICATION FOR AUGUST 2008

HELLO, MR. POWERS!!

MY NAME IS FRANCINE YATES. I CAME INTO YOUR OFFICE LAST MONDAY, MAY 12, 2008 REGARDING MY LAW SCHOOL APPLICATION AS WELL AS THE LETTER I WAS SENT WHICH DID NOT GRANT ME ADMISSION. I EXPLAINED MY SITUATION TO YOU AND THE FACT THAT I DO HAVE A DISABILITY. YOU TOLD ME THAT YOU WOULD SPEAK TO THE BOARD AGAIN ABOUT MY APPLICATION AND GET BACK TO ME BY FRIDAY, MAY 23,

*EXHIBIT F*

Dear Ms. Yates:

I am afraid that we are unable to admit you. If you can pull your LSAT score into the mid 140s, you would have a much better chance.

Sincerely,

William B. Powers
Associate Dean for Admission and Student Affairs
The John Marshall Law School
315 South Plymouth Court
Chicago, Illinois 60604
6powers@jmls.edu

www.jmls.edu

**From:** Scott, Olga
**Sent:** Friday, May 30, 2008 1:59 PM
**To:** Powers, William
**Subject:** FW: LAW SCHOOL APPLICATION FOR AUGUST 2008

**From:** Harmoney Ubanks [mailto:]
**Sent:** Saturday, May 24, 2008 10:11 AM
**To:** Scott, Olga
**Subject:** Fw: LAW SCHOOL APPLICATION FOR AUGUST 2008

hello, OLGA! MY NAME IS FRANCINE YATES. I CAME IN TO SEE YOU ON FRIDAY, MAY 23, 2008. I ASKED TO SPEAK WITH MR. POWERS, BUT YOU TOLD ME THAT HE WAS OUT OF THE OFFICE, ATTENDING A CONFERENCE AND THAT HE WOULD NOT BE BACK UNTIL JUNE 2, 2008. THIS IS THE EMAIL THAT I FORWARDED HIM. CAN YOU PLEASE TRY CONTACTING HIM VIA PHONE FOR ME AND HAVE HIM EMAIL ME WITH A RESPONSE AS SOON AS POSSILBE. I HAVE ENCLOSED MY EMAIL ADDRESS IN THIS EMAIL AS WELL. THANKS!

----- Forwarded Message ----
From: Harmoney Ubanks <harmoneyluv@yahoo.com>
To: 6powers@jmls.edu
Sent: Saturday, May 24, 2008 9:07:21 AM
Subject: LAW SCHOOL APPLICATION FOR AUGUST 2008

HELLO, MR. POWERS!!

MY NAME IS FRANCINE YATES. I CAME INTO YOUR OFFICE LAST MONDAY, MAY 12, 2008 REGARDING MY LAW SCHOOL APPLICATION AS WELL AS THE LETTER I WAS SENT WHICH DID NOT GRANT ME ADMISSION. I EXPLAINED MY SITUATION TO YOU AND THE FACT THAT I DO HAVE A DISABILITY. YOU TOLD ME THAT YOU WOULD SPEAK TO THE BOARD AGAIN ABOUT MY APPLICATION AND GET BACK TO ME BY FRIDAY, MAY 23,

*EXHIBIT G*

**harmoneyluv**    Offline Yahoo! | My Yahoo! | News
Sign Out, My Account, Mail Classic

Search the Web...    Search

**Home**    **Inbox** 32 messages         **RE: Paperwork**         **RE: LAW SC**

Delete    Reply    Forward         Spam    Move    Print  M

Check Mail    New

Search Mail...    Go

See your credit
score - free

**Inbox** (1)
Drafts
Sent
Spam    Empty
Trash    Empty
Contacts    Add
Calendar
Notepad
All Feeds    Add
My Folders    Add

Free Phone
+ Bluetooth®

Print FREE
Grocery Coupons

Who's Looking
For You

**RE: Re: LAW SCHOOL APPLICATION FOR AUGUST 2008**
"Powers, William" <6powers@jmls.ed...    Add
To: Harmoney Ubanks <harmoneyluv@yahoo.com>         Loading...

Dear Ms. Yates:

I am afraid I will not be able to meet with you next week. I have attempted to answer a
more information to impart.

Law school admission remains very competitive. We had over 3,000 applicants for ou
be able to consider you for admission.

Sincerely,

William B. Powers

Sent with Good (www.good.com)

-----Original Message-----
From:    Harmoney Ubanks [mailto:harmoneyluv@yahoo.com]
Sent:    Thursday, June 05, 2008 12:57 PM Central Standard Time
To:    Powers, William
Subject:    Re: LAW SCHOOL APPLICATION FOR AUGUST 2008

Dear Mr. Powers:
I just stopped by your office about 1 hour - 1 1/2 hourss ago. I was told that you were
on 6/10/08 at 3:00 p.m. Please try to keep this appointment because I am homeless
walking. Lately, I have been given a few dollars from some of my family members to
back the money that I was given.
On Monday, May 26, 2008, the undercover mexican cop that has been living in the P
around 6:45 a.m. She staged a false arrest by several cops and complained that I was
charged me with a battery and not an assault on a police office. I was not given her r
assault happened inside PGM. I never touched the woman. I was searched, finger p
Huberman authorized the arrest. All of the white cops stood back and let the black c
told them that Ron Huberman authorized the arrest because he offered me $100 milli
lawyer and 25% of 25
million dollars to be attached to my settlement if i would hold on the embezzled mone
me under investigation with the internal affairs unit and one case, Ronald Huberman
emailing me. I asked him what he wanted. He stated that he wanted me to effect the
immature and to add insult to injury that he had the nerve to be short. I told him to st
spam and started back with the emails. He has consistently sent me emails, about 1!
specifically asked me if I wanted to lick chocalate off his penis. My response to him v
he is into
oral sex with women. One email stated that he was in his bedroom naked and that he
$50 that would let one experience an ultimate orgasm very quickly. He made a refere
expressed penetrating me in various positions allowing me to experience a few orgas
meeting my soul mate, getting married, lasik treatment for my eyes, colon cleansing r
attorney, buying a private jet and getting a custom made house built in Costa Rica. C

TODAY: 7/14  No events. Click the plus sign to add an event.




EXHIBIT H

Thank you for letting me know when you will be coming. Attached to your paperwork I will give you a 1-day unlimited CTA pass as compensation.

Your paperwork will be in a large envelope at the main security desk.

Dave Martino, CPP
Security & Safety Manager
The John Marshall Law School
315 S. Plymouth Ct.
Chicago, Il 60604
(312)427-2737 x.339

**From:** Harmoney Ubanks [mailto:harmoneyluv@yahoo.com]
**Sent:** Tuesday, June 17, 2008 1:27 PM
**To:** Martino, David
**Subject:** Re: Paperwork

I will be there on Friday, May 20th before 12:00 noon to pick up the paperwork. I need a copy of all the documents that I filed for the 1/14/08 and the 8/20/08 admission. Please do not hand me anything through the door like I am a criminal or some *trashy piece of nigger* on the side of the street that you can treat anyway and expect to get away with it just because you can. Also, don't call the police and lie and state that *I hit, threatened, battered, robbed or raped a Mexican, some White person or blacks that have decided to get in it to help wound me even greater and tear me down.* I never did have to stop and see security before this happened unless I was attending a free conference. Most of the time when I attended the free conferences, the security guard never asked me for a I.D. or to sign in, he treated me with respect, dignity and granted me access just the same as a white person. I guess I can't attend any more free conferences or seminars but everyone else can.

You could have given me these items when I was down town. This is imposing a tremendous hardship on me! Do not send anything to me in the mail. Also, can you reimburse me my $8.00 for transportation for the two days (total = about $16.00) I came down town when I specifically asked William Powers to let me know if he would not be able to meet with me? It was extremely ignorant of him to hide behind closed doors, intentionally treat me the way that he did and humiliate me because he thought that he could. It will also cost me about $8.00 to commute in on Friday. I do have a right to be in the downtown area since the black workers at Millieum Park have been harassing the hell out of me just for being black, homeless, female and in the park and Chicago altogether. Also how about refunding me the $60 application fee plus the $2.00 for the money order I had to purchase and an additional $8.00 for the interest that I agreed to pay back to the methodist church? Your application asked about a socioeconomic disadvantage and homelessness does qualify. There has to be some money in your scholarship fund to assist with this disadvantage or the application would not have asked. Also, go in your pocket or william's and find some money so that I can pay pack the people I borrowed from. It is not fair to them that you have done this to me on purpose. A financial hardship was imposed on them as well as to loan me the money.

Also, I called the Feds and spoke with Patrick Fitzgerald about the whole ordeal with Mayor Daley and Ron Huberman, I also mentioned that the John Marshall Law School was involved by deliberately trashing my application all because you thought you could. (More than likely under the direction of Mayor Daley and Ronald Huberman) There is going to be a huge federal investigation. God does not intend to let anyone of you get away with all that you have done to me. I don't think it's funny. I was treated like a dog and a black criminal at the lowest point in my life my a Law School . This is the lowest form of humiliation that I have experienced in my entire life next to what Ronald Huberman and Mayor Daley has done to me all because I opposed unlawful discrimination. We all reap what we sow and the reaping is always greater than the seed that is sown. I am going to speak with the pastor of the

### THE JOHN MARSHALL LAW SCHOOL STUDENT HANDBOOK 2007 – 2008

From the
Associate Dean for
Admission and Student Affairs



Dear Students,

As the Associate Dean for Admission and Student Affairs, it is my responsibility and pleasure to serve the needs of students in every possible way. I oversee the Office of Admission and Financial Aid, the Academic Services Office, the Career Services Office, as well as the Office of Student Affairs. It is my strong belief that we must all work together to give you every advantage that the school has to offer. Please know that my door is open to you, and my staff will always be available to assist you and to address your concerns.

If you have any questions, please do not hesitate to contact us.

I look forward to helping you face the challenges of your law school experience.

Sincerely,

*William B. Powers*
Associate Dean for
Admission and Student Affairs

EXHIBIT

## THE JOHN MARSHALL LAW SCHOOL STUDENT HANDBOOK 2007 – 2008

1.    Repeat any courses where they earned an "F."

2.    Successfully complete Corporations, Estates and Trusts I, Payment Systems Law, Remedies, and Writing for the Practice of Law before graduation. Any student who fails one of these courses must repeat the course before he or she will be permitted to graduate.

3.    Take no more than one seminar course and one practice course in a calendar year. A seminar course is a course with a limited enrollment and a publishable paper as a grade requirement. A practice course is a course oriented toward dealing with such problems as pretrial practice or counseling and negotiations.

Any student who knowingly fails to comply with these rules may have additional requirements imposed on him/her as a condition of graduation.

Individual students whose overall class rank after completion of the required first-year classes (second semester day division, third semester evening schedule) indicates that they will have difficulty doing adequate work in upper division classes and are at considerable risk of failing pertinent licensing examinations, shall be considered "at risk." The faculty may, by rule, establish special academic rules and requirements for "at risk" students. The Dean may require "at risk" students to take the Writing for the Practice of Law* course.

*This course develops and enhances effective legal writing under pressure. Students write for 90 minutes in class every week. Illinois Civil Procedure is the substantive basis of the problems.

### PROBATION AND ACADEMIC DISMISSAL POLICY

A student who attains a grade point average of below 1.75 in the first semester of law school will be dismissed. A student whose cumulative grade point average is below 2.25 at the end of any fall or spring semester will be placed on academic probation, and must raise his or her cumulative grade point average to at least 2.25 by the end of the next semester and summer adjoining the next semester in which the student enrolls. A student is eligible for probation only once; if a student's cumulative grade point average again falls below 2.25 after any subsequent fall or spring semester, the student will be dismissed.

### THE GRADING CURVE

#### CURVE I

In Civil Procedure I, Constitutional Law I, Contracts I & II, Criminal Law, Property, and Torts, provided the enrollment is 20 or more students, faculty shall conform their grades to the following standards:

*Required Grades*
Grades of A+, A, and A- shall be awarded to no fewer than 20% and no more than 30% of the class.
Grades of B+, B, and B- shall be awarded to no fewer than 35% and no more than 45% of the class.
Grades of C+, C, and C- shall be awarded to no fewer than 15% and no more than 25% of the class.
Grades of D and F shall be awarded to no fewer than 10% and no more than 20% of the class.

**Required Cumulative Average**
For the class as a whole, the cumulative average grade shall fall between 2.70 and 3.10, inclusive.

#### CURVE II
In every JD course not subject to Curve I, other than Lawyering Skills and Trial Advocacy, provided the enrollment is 25 or more students, faculty shall conform their grades to the following standards:

EX HIBIT A

designation. The student was ranked 80/238; 80 divided by 238 is .33, so the student was in the top 33 percent of the class).

Class rankings are unofficial until the date of graduation. Afterward rankings become official and are computed to the fifth decimal point to lessen the possibility of a tied grade point average.

### E.  Residency Requirements

To receive residence credit for an academic semester, a student shall be enrolled for not fewer than eight credit hours. In order to graduate in six semesters a student shall be enrolled in each semester for not fewer than 10 credit hours and must receive credit for nine credit hours. If a student fails to receive credit for the specified number of hours, the student may receive residence credit only in the ratio that the hours enrolled in or in which credit was received, as the case may be, bear to the minimum specified. Pro rata residence credit may be awarded for study during a summer session on a basis that fairly apportions a student's effort to the usual residence period.

### F.  Attendance

The Board of Law Examiners in each state requires a certificate of attendance from the law schools attended by the applicant to take the bar examination. To execute this certificate faithfully, the school must insist on regular attendance. Therefore, students are required to attend all classes scheduled. A student absent for more than 25-percent of the total number of class meetings will not be allowed to write the examination and will receive a grade of WF (withdraw/fail) for the course, unless permission has been granted by the Associate Dean for Academic Affairs. The number of absences permitted may be reduced by the professor on notice to the class.

### G.  Disability Policy

There are a number of students with disabilities in the law school. The law school works with these students to accommodate their individual needs. A student who asks for reasonable accommodations due to a specific disability must provide acceptable evidence of the disability. The law school may require the student to take designated tests at his or her expense from a qualified medical or educational professional chosen by the school. Please stop in the Academic Services Office, room 301, for more information.

### H.  Interruption of Study

Applicants who seek to resume their legal studies will be evaluated according to the length of the absence, their college record, and law school performance. Those interested must write to the Registrar for instructions.

### I.  Employment Policy

Full-time students should remember that classes require substantial time for preparation. They may not be employed more than 20 hours per week according to Standard 304(f) of the American Bar Association Standards for Approval of Law Schools. Each semester full-time students are required to certify at the time of registration that they will not be employed more than 20 hours per week.

### J.  Transcripts

No official transcript of record is given directly to a student or to a graduate. An official transcript will be sent to another school or to any authorized agency upon request to the Academic Services Office. A transcript will not be issued unless all fees owed to the law school are paid.

### K.  ENROLLMENT IN ANOTHER LAW SCHOOL

With prior approval, John Marshall students may take up to six hours of elective credit at another American Bar Association-approved law school. Credit for the work is subject to certain restrictions, including a requirement that the student achieve a minimum grade of C. Courses in which students received grades lower than C will not be accepted. Credit accepted from other approved law schools is not computed in the

EXHIBIT  C

cannabis, depending on the amount involved. Fines of up to $100,000 may be imposed. Depending on the amount and type involved, the penalties for dealing controlled substances range from a Class 3 felony to a Class X felony. Fines of up to $500,000 may be imposed. With respect to drug possession, possession of any substance containing cannabis can range from a Class C misdemeanor to a Class 3 felony. Depending on the amount or type of substance involved, the penalties for possessing a controlled or counterfeit substance range from a Class 4 felony to a Class 1 felony. The offenses carry a maximum prison sentence of 50 years and a fine of up to $200,000 or the full street value of the substance, whichever is greater. There are many health risks associated with the use of illicit drugs and the abuse of alcohol. Alcohol consumption in even low doses causes a number of marked changes in behavior. Repeated use of alcohol can lead to dependence. Long-term consumption of large quantities of alcohol, particularly when combined with poor nutrition, can lead to permanent damage to vital organs such as the brain and liver.

To educate employees and students on the dangers of drug abuse, the law school has established a drug-awareness program. As part of the law school's program, materials are periodically made available to all employees and students, describing the dangers of drug and alcohol abuse, the law school's policy regarding drugs and alcohol, and the availability of counseling. The law school will impose disciplinary sanctions consistent with local, state and federal laws on students and employees who violate the standards of conduct outlined above. Students who violate rules prohibiting illicit drug and alcohol possession or distribution are subject to expulsion. Employees who violate any aspect of this policy are subject to dismissal. At its discretion, the law school may require employees or students who violate this policy as a condition of remaining employed by or enrolled in any law school program to successfully complete a drug-abuse assistance or rehabilitation program. Sanctions under the Act may also include referral to appropriate authorities for prosecution. The Associate Dean for Academic Services is responsible for enforcement of the law school's Drug and Alcohol abuse policy.

## DISCRIMINATION/HARASSMENT PREVENTION POLICY

### Harassment Prevention Policy

It is the policy of The John Marshall Law School to provide an educational and work environment free from offensive, harassing, or discriminatory behaviors on the basis of sex, sexual orientation, race, color, religion, national origin, ancestry, age, disability or any other legally protected characteristic. This prevention policy applies to all aspects of employment including, but not limited to recruiting, hiring, promotion and discipline, as well as all aspects of the educational process including, but not limited to recruiting, admission, evaluation and participation in educational activities. A violation of this policy does not necessarily rise to the level of a violation of law.

### PROHIBITED BEHAVIORS

An essential element of this policy is the prohibition against offensive, disrespectful, or demeaning behaviors and/or communications that are sexual in nature or context. Prohibited behaviors include, but are not limited to:

- Making unwelcome sexual advances, requests for sexual favors, or engaging in other offensive verbal or physical conduct of a sexual nature when the conduct is sufficiently severe, persistent, or pervasive to either limit an individual's ability to participate in (or benefit from) an educational or work program or activity or create a hostile educational or work environment.
- Explicitly or implicitly conditioning an individual's participation in an educational or work program or activity, or basing an education or work-related decision on an individual's submission to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature.

Prohibited behaviors can be verbal, non-verbal, or physical. Examples of prohibited verbal behaviors include, but are not limited to sexual innuendo, sexual propositions and comments, insults, threats, and jokes about gender-specific traits. Examples of prohibited non-verbal behaviors include, but are not limited to sexually suggestive or insulting noises, obscene gesture and display of sexually suggestive objects or

EXHIBIT A

pictures. Examples of prohibited physical behaviors include, but are not limited to unwelcome touching and coercive sexual contact.

### APPLICATION TO ALL PERSONS

This policy prohibits all students, employees, and faculty from engaging in behaviors inconsistent with this policy and protects all students, employees, and faculty from prohibited behaviors by other students, employees, and faculty or third persons. The law school will take reasonable care to prevent and eliminate behaviors inconsistent with this policy. Once notified of such behavior, the law school will take prompt and effective action.

### REPORTING AND INVESTIGATION

Persons who experience offensive behaviors inconsistent with this policy may report it by any one of the following methods:
- Leaving a voicemail report on the John Marshall Law School Harassment Prevention Hotline: 312.427.2737 x506.
- Reporting behaviors to any Dean, manager, or supervisor, including the offending employee's supervisor.

Reports of offensive behaviors inconsistent with this policy should be made promptly after the alleged policy violation occurs. The submission of an internal report does not preclude the complainant from seeking relief elsewhere.

### CONFIDENTIALITY

All such reports will be handled as promptly and confidentially as possible. Although information will be limited to those with a need to know, the law school cannot guarantee anonymity or confidentiality.

### ENFORCEMENT ASSIGNMENTS

Either the Vice Dean or the Associate Dean for Academic Affairs shall enforce this policy as it applies to students and faculty. The Associate Dean for Administration will enforce this policy as it applies to non-faculty employees and other individuals. The Associate Dean for Academic Services is responsible for coordination of the law school's compliance with Section 504 of the Rehabilitation Act of 1973.

### VIOLATIONS OF POLICY

Any individual whose behavior is found to be inconsistent with this policy shall be subject to appropriate corrective and/or disciplinary action, including, but not limited to reprimand, additional training, demotion, transfer, expulsion or discharge, subject to applicable faculty and student disciplinary procedures. Violations of this policy do not necessarily rise to the level of a violation of any law.

### NON-RETALIATION

The law school will take reasonable care to protect persons who report behaviors inconsistent with this policy or who cooperate in the investigation from retaliation or other adverse action. No such individual will be adversely affected in the terms and conditions of his or her employment or education for either making such a report or cooperating in the investigation of a report. Reports of retaliation will be investigated as promptly as is practical and corrective action will be taken as appropriate.

### DISSEMINATION OF POLICY

A copy of this policy is given to students in the student handbook, posted in areas where all persons may review it, including the law school's Business Office Intranet site, and may be obtained upon request from any Dean, department head, or supervisor.

EXHIBIT

## XXIV.    SAFETY PROCEDURES

### EMERGENCY EVACUATION GUIDE – UTILITY FAILURE

In the event of any building-wide loss of power or water, all students, faculty, and staff are to evacuate the law school immediately and efficiently.

Use the inner stairs to evacuate the building. If you hear someone trapped in an elevator, please inform security as soon as possible. Ask persons who are disabled how you can best assist them in the evacuation. In the event of a power loss, emergency lighting will provide sufficient illumination in corridors and stairs for safe exiting for a short time, though elevators will not function. Everyone must evacuate the law school if a power loss occurs.

Once outside, move south to the alley area between the parking garage and the park (the "designated area"). Keep the walkways, fire lanes, and hydrants clear for emergency crews.

**DO NOT RETURN TO AN EVACUATED BUILDING** unless told to do so by an authorized school official. Information about the evacuation and possibility of re-entering the building will be announced in the designated area.

### EMERGENCY EVACUATION GUIDE – FIRE

In case of fire on campus, dial 9-911, then security at ext. 507.
Stay Calm. Keep others calm.

1.  Learn the location of fire extinguishers, fire exits, and alarm systems in your area and know how to use them.
2.  If a minor fire appears controllable IMMEDIATELY contact the fire department and security. Then pull the fire extinguisher from the wall and promptly direct its discharge at the base of the flame.
3.  If an emergency exists, activate the building alarm.
4.  On large fires that do not appear controllable, immediately notify the fire department by calling 9-911. Then evacuate the involved room, closing all doors to confine the fire and reduce oxygen. Do not lock doors. Pull the fire alarm if the alarm is not already going off.
5.  If you hear the building alarm, or are instructed to evacuate by faculty of staff, walk quickly to the nearest marked exit and alert others to do the same. Faculty in class are responsible for directing students to the nearest exit and confirming that all students have exited. If you are not in a classroom when an alarm sounds, evacuate the building via the nearest inner staircase. Only use the exterior fire escape if all interior escape routes are blocked by smoke or flame.
6.  Remember that elevators are reserved for disabled persons. Do not use elevators in case of fire. Stay calm. Keep others calm.
7.  Once outside, move to the designated meeting area which is in the alley between the park and the parking garage.
8.  Follow the directions of faculty and administrative staff until you are outside and at the meeting point.
9.  Do not return to an evacuated building unless told to do so by an authorized school official.
    Note: If you become trapped in a building during a fire and a window is available, place an article of clothing (shirt, coat, etc.) outside the window as a marker for rescue crews. Stay near the floor where the air is less toxic if there is no window. Shout at regular intervals to alert emergency crews of your location.

# The JOHN MARSHALL LAW SCHOOL

Office of Admission
& Financial Aid
Tel: 312.987.1406
      800.537.4280
Fax: 312.427.5136
E-mail: admission@jmls.edu

May 5, 2008

Ms. Francine Yates
1458 South Canal Street
Chicago, IL 60607

Dear Ms. Yates:

In considering all the criteria in support of your application, the admission committee regrets that it cannot accept you for admission. We appreciate your interest in The John Marshall Law School and send our good wishes for your future endeavors.

Thank you again for considering our school.

Very truly yours,

William B. Powers
Associate Dean
Admission and Student Affairs



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Francine Yates,<br><br>    Plaintiff,<br><br>v.<br><br>The John Marshall Law School<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**08CV4127**
**JUDGE ASPEN**
**MAGISTRATE JUDGE COX**

### NOTICE OF FILING

TO:   The John Marshall Law School
       Attn: Dean William Powers
       315 S. Plymouth Court
       Chicago, IL  60604

**FILED**

JUL 2 1 2008 TC
Jul 21, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

     Please take notice that on July 21, 2008, I will file with the Clerk of the Circuit Court of Illinois, First District, Chicago, Illinois, the attached Order, a copy which is hereby served upon you.

                                _Francine Yates_
                                Francine Yates, Pro Se

### PROOF OF SERVICE

I hereby certify that I have served a copy of the within Notice and Order upon the above addressee by hand delivering the same to them on this 21st day of July, 2008.